(28 App. Div. 508.)

### McFADDEN v. MORNING JOURNAL ASS'N.

(Supreme Court, Appellate Division, Second Department.   April 26, 1898.)

1. LIBEL—MATTER LIBELOUS PER SE.
   The defendant published in its newspaper an article concerning plaintiff, a young lady, purporting to describe an alleged rowing race between her and another young lady, on a lake in a public park, as "a race for a beau with a handsome face." The article gave the names of the young ladies, and of the young man, who was described as standing on the bank watching the race, while "fair feminine friends" "encouraged each earnest, anxious aspirant," with much other matter of a similar character, every particular of which was false and absolutely without foundation. *Held*, that the article was libelous per se.

2. SAME—EVIDENCE OF MALICE.
   The article itself furnished proof that the publication was made after knowledge of its falsity. *Held*, that this, taken in connection with evidence of such falsity, was sufficient, prima facie, to establish the existence of malice.

3. STATEMENTS OF COUNSEL.
   In an action based on the libel, the complaint alleged that it had caused evil-minded persons to write to plaintiff letters ridiculing her, and subjecting her to insults, and in his opening plaintiff's counsel stated that he intended to prove the receipt of such letters. Upon defendant's objection, the court told the jury to disregard the statement, "unless the letters were read in evidence." They were not in fact offered or again referred to. *Held*, on appeal by defendant, that defendant's failure to demur or to move to strike out gave plaintiff's counsel the opportunity to refer to the letters, and that there was no error in the ruling.

4. SAME—WAIVER OF OBJECTIONS.
   Defendant's counsel excepted to the statement of plaintiff's counsel in summing up that "Mr. Hearst has millions, and this paper has accumulated millions, no doubt through just such publications." In his charge the judge

instructed the jury that statements of counsel were not evidence; that there was no evidence of the existence of any "Mr. Hearst," or of his millions, or of his making any of it out of the paper. *Held*, that as defendant did not ask to withdraw a juror, or discharge the jury, he must be assumed to have been satisfied with the ruling.

5. LIBEL—EVIDENCE.
Defendant put in evidence other newspapers which also contained descriptions of the same alleged "race," whereupon plaintiff was allowed to give evidence to prove their falsity. *Held* no error.

Appeal from trial term.

Action by Nellie McFadden against the Morning Journal Association. From a judgment entered on a verdict for $3,000, and from an order denying defendant's motion for a new trial, it appeals. Affirmed.

Argued before GOODRICH, P. J., and CULLEN, BARTLETT, HATCH, and WOODWARD, JJ.

B. F. Einstein, for appellant.
Foster L. Backus, for respondent.

GOODRICH, P. J. The complaint alleged that on August 4, 1894, the following article appeared in the Morning Journal, a widely circulated newspaper published by the defendant:

"Row, Nell! Pull, Mame!

"Two Girls Row a Race for a Beau with a Handsome Face. Prospect Park Lake Turned into a Cupid's Course, with a Fringe of Femininity.

" 'Hurry up, Nellie! Oh, do hurry!'

"Shrill shrieks from fair feminine friends enthusiastically encouraged each earnest, anxious aspirant as she shook shining drops daintily from the blades of her oars and pulled for dear life.

" 'Move up, Mame! Look out! She's crawling away from you!'

"Mamie bent to her work like a little man, and sent the sculls shooting through the shimmering stream as she strove frantically to overtake her opponent.

" 'Hurry up, Nellie! Hurry, hurry! Oh!'

"The occasion was the great Prospect Park quarter mile junior singles, for the Cupid cup. Miss Nellie McFadden (a prize for Aladdin), and sweet Mamie Barton (you'd sure lose your heart on), had both set their caps for young Frederick Bohn; so, with a friend and relation, they went to the park, to give demonstration ('twas just before dark), by rowing a race,—an aquatic love chase,—of their love for this perfectly proper Don Juan.

" 'Spurt, Mamie! spurt! She's winning on you!'

" 'Hurry, Nellie, hurry! Oh, she's catching up to you! Goodness gracious!'

"Freddy stood upon the bank and watched the race; he gave no sign, he spoke no word, no shadow crossed his face; but some do say his sweet blue eyes were blinded by a mist, as he wondered by which lovely lass next moment he'd be kissed.

"Poor, poor Freddy!

" 'Now, Mamie! Now you've got her! Pull hard. Look out, or she'll foul you!'

" 'Oh, what a mean, contemptible shame!'

" 'Hurry, Nellie! She'll pass you if you don't mind. Oh, do, please hurry!'

"Nellie hurried.

"So did Mamie.

"Nellie took a couple of reefs in her balloon sleeves (the wind was blowing dead against her), and pulled till the handles of the oars burned her pretty pink palms.

"But Mamie bit off another hunk of Tutti-Frutti, braced her feet against the rests, took one backward glance over her shoulder, and spurted.

" 'Hurry, Nellie! Hur—'

" 'Good thing, Mamie; push it along!'

" 'Oh, Nellie, Nellie, do hurry! Oh, my, she's past you!'

"And so she had. That last grand spurt had been too much for Miss McFadden. Miss Barton had passed her easily, and was holding a steady lead of two lengths.

"With a silver-plated laugh of scorn that would make her fortune as a tragedienne of the Clara Morris school, Mamie shipped her oars and actually drifted home! She crossed the line nine lengths ahead of her discomfited rival.

"Freddy helped Mamie out of the boat with a loving glance, and then—wasn't it sweet of him?—he extended the tips of his fingers to Nellie, and helped her ashore, too.

"Mamie received the congratulations of her friends. Then she marched off triumphantly with her beloved fin-de-siecle Adonis, leaving Nellie sitting on a bench, weeping bitterly.

"Late last night there was more indignation welled up in the heart of Frederick Bohn than the said heart could hold. He started out for the young man who had acted as volunteer press agent for the tale of love and muscle.

"He found him in the person of Henry Gersen, of 171 Heyward street, Williamsburg, who is not only young but ambitious. Bohn called at Gersen's home, and by some means persuaded him to meet a number of reporters, to whom Gersen admitted that his imagination was responsible for the facts.

"Gersen told how he had evolved the scheme, and then departed, with Bohn still filled with indignation. This broke loose as the couple were going downstairs, and now Gersen needs no imagination to lend excitement to the trip."

The complaint also alleged that the article held up and subjected the plaintiff to ridicule and shame, and had "caused evil-minded persons to send through the mail to plaintiff letters ridiculing the plaintiff, and subjecting her to indecent suggestions, proposals, and insults."

The answer admitted the publication, denied that it was made maliciously, and alleged that the article was published with the consent of the plaintiff; and, as partial defense and in mitigation of damages, set out five articles of the same general character and substance, which were published on August 3d in the Brooklyn Citizen, the Brooklyn Eagle, the Brooklyn Standard Union, and the New York Evening World, and, on the 4th of August, in the New York Morning World. These articles were annexed to and formed a part of the answer.

In opening the case, the plaintiff's counsel stated, in substance, that he intended to prove that the plaintiff had received hundreds of indecent or immoral missives, sent to her by degraded men, who had formed an estimate of her character by reason of the article published by the defendant. The defendant's counsel objected to these remarks, whereupon the court said: "Now, I will take occasion here to tell the jury that they must disregard anything that he says about his intention to offer letters of such a character in evidence, unless those letters are admitted in evidence and read to them." There followed some other remarks between court and counsel, and some further exceptions of the defendant, but there is in the record no subsequent reference to these letters and no offer of them in evidence. No instruction as to these letters was asked by the defendant's counsel or given to the jury in the charge, and the incident may be regarded as having been closed at this time. There was no error in the court's treatment of the matter. The plaintiff in the complaint had alleged her receipt of the letters, and the complaint was not demurred to, nor had there been any motion to strike out the allegations as irrelevant or scandalous, in accordance with section 545 of the Code of Civil Procedure. The complaint as it stood might have been read to the jury by counsel at any stage of the trial. It is undoubtedly true

that the letters were inadmissible in evidence, but that was a question to be decided when they were offered. That they were never offered does not affect the defendant's exception to the remarks of the plaintiff's counsel in his opening. The failure of the defendant to demur or move to strike out gave the plaintiff's counsel opportunity to refer to the letters in his opening, and there was no error in the ruling of the learned court in this respect.

On the same general subject, though somewhat in advance of the order of trial, we refer at this time to an exception taken by the defendant after the plaintiff's counsel had summed up:

"Mr. Einstein [defendant's counsel] excepts to the statement of Mr. Clarke [plaintiff's counsel] in summing up that Mr. Hearst has millions, and that this paper has accumulated millions, no doubt, through just such publications."

The court, in its charge, said:

"The province of counsel in the case is a useful one. In the first place, they prepare their cases before they come to court, so as to present their evidence in an orderly way, and direct your attention to the particular issues in the case, and, finally, they sum up their case, marshaling together the circumstances that they seem to think sustain and uphold their particular contention or side of the case. But their statements are not evidence, and you must bear that in mind when you come to the consideration of the facts in the case. For instance, counsel for the plaintiff called your attention to some gentleman by the name of Hearst, claimed that he had millions, and that he had them in this paper. Now, there is no evidence that there is any such person as Mr. Hearst in the world; no evidence that if there is such a person he has millions, or that he made any of it out of this paper. So eliminate all the foreign matter from your consideration of this case, and determine the case upon the evidence."

As no further request was made by the defendant's counsel, it must be assumed that he was satisfied with and accepted the situation, as it would be doing him injustice to suppose that he thought the exceptions above stated were fatal, in any event, to any verdict which might be given for the plaintiff. In this condition of affairs, after either incident, he might very properly have asked the court to withdraw a juror, or to discharge the jury from a further consideration of the case. As he made no such application, we may assume that he was satisfied with the ruling of the court upon the subject.

The defendant excepted to evidence of Mrs. McFadden, a sister-in-law of the plaintiff, who was being examined as to the truth of the article in the Brooklyn Citizen which made reference to her. She was permitted to testify that the article in this respect was false, although the defendant's counsel objected that such evidence was immaterial and irrelevant, and that it did not go to negative anything in the defendant's article. This renders necessary a statement of the course of the trial.

The plaintiff testified in her direct examination that there was not a word of truth in the defendant's article; that on the day referred to she and another young woman were going into the park, when they were accosted by a young man whom she knew only by sight, and who told them not to go further in the way they were walking, as there was some quarrel in that direction; that some other conversation ensued, during which he told them that he was a reporter for the World, and could put a nice notice in that paper about them, if

they wanted him to do so; that his sister had gone away from the city, and that he had done the same thing for her; that the plaintiff said she was going to the Catskill Mountains, and that he might say that, and that he said he would do so, and that this ended the interview; that she did not know any person named Frederick Bohn, whose name appears in the article as the lover. In her cross-examination this so-called reporter of the World is referred to as Henry Gersen, whose name also appears in the defendant's article, and who is alleged in the answer to be the person who had the interview with the plaintiff and her friend. The defendant's counsel, on cross-examination of the plaintiff, proved that on the 3d of August she saw the articles in the Eagle, Times, and Citizen, and then offered them in evidence, and they were read to the jury. The plaintiff did not admit that she saw the article in the Standard Union, but that article also was offered and read in evidence. She testified that she had not sued the owners of any of these papers; that she saw also the article in the Evening World, and had brought action against its proprietors. Under these circumstances, the articles having been put in evidence by the defendant, it was competent for the plaintiff to be examined to prove their falsity, and the ruling of the court on that subject was proper. The plaintiff had testified that the article in the Journal had caused her to cry, and had kept her from sleeping and eating and going into society, and made her feel as if she were of no account, and that that feeling had continued until the trial.

In his argument before this court, the defendant's counsel stated that the articles from the papers, other than the Journal, were put in evidence to show that the plaintiff's great anguish and distress did not and could not have resulted entirely from the article in the Journal, as she had seen some of the other articles on the previous day; and that the testimony was inadmissible, as those articles were not in issue, and the proof of their falsity could have no other result than to confuse the real issues, and tend to make the defendant liable for the false publications in the other newspapers. But as the defendant in its answer spread these articles on the record, and put them in evidence at the trial, it was not error to permit the plaintiff to deny their truth.

The defendant further contended that the article in the Journal was not libelous per se, and that, as no special damage was alleged or proven, the motion to dismiss the complaint should have been granted. Knowing the eminence of the learned counsel for the defendant, and his familiarity with the law of libel, we are at a loss to understand his vigorous argument that the article in question is not libelous per se, and that an averment of special damages should appear in the complaint. His only citation of authority is the dissenting opinion of O'Brien, J., in Gates v. New York Recorder, 155 N. Y. 228, 233, 49 N. E. 769. This does not bear out his contention, for the learned judge said:

"A publication is libelous on its face when the words impute to the plaintiff the commission of a crime, or a contagious disorder tending to exclude him from society, or when the injurious words are spoken or published with respect to his profession or trade, or disparage him in a public office, or tend to bring him into ridicule and contempt."

Thus it will be seen that the opinion of Judge O'Brien recognizes the principle that an article is libelous per se which tends to bring a party into ridicule and contempt.

Pen. Code, § 242, defines a libel to be, among other things, a malicious publication by writing, printing, picture, effigy, sign, or otherwise than by speech, which exposes any living person to contempt, ridicule, or obloquy, or which causes, or tends to cause, a person to be shunned or avoided. It requires hardly more than a casual reading of the article to enable us to decide that it falls exactly within the definition of a written publication which exposes the plaintiff to contempt, ridicule, and obloquy, and which causes, or tends to cause, her to be shunned or avoided. It charges her with ridiculous, immodest, and forward behavior, such as no respectable girl could be guilty of without meeting the condemnation of every right-minded man and woman, and gives rise to the suggestive suspicion that the woman guilty of such behavior was loose in conduct and ready for adventure, without regard to the becoming modesty of a woman. The delineation of two young women engaged in a muscular contest for the affection of a lover might have passed current in the Middle Ages, but it is not in accordance with the more refined ideas of the nineteenth century, no matter what may be the woman's station in life. There can be no question that the article is libelous per se. See, also, Gates' Case, supra.

There was also evidence tending to show that the publication was made after knowledge of its falsity, and this, taken in connection with evidence of such falsity, is sufficient prima facie to establish the existence of malice. Barber, a witness called by the defendant, testified that he made up the article; that Mr. Ferguson, one of the editors of the Morning Journal, handed him the articles from several of the evening papers, and told him "to make a spread of it," which he defined as referring to the length of the article and character of the head lines; that he made up the article after reading those from the other papers; that there are matters in his article which were not in the others, and for which he had no other authority than his own embellishing imagination. He said:

"I suppose I thought it was funny. I don't see that it was at the expense of the girl exactly. You are asking me for my opinion. I don't see that it was at her expense. I expected that it would be a humorous article when I wrote it. The purpose of my writing it was to present what I believed to be a humorous story, a humorous collection of facts, in as bright and as fresh language as I could. My object was to write it in such words that the humor of the situation would strike the people who would read it."

The "humor of the situation" is apparent, but it was humor at the expense of the plaintiff, in holding her up to public ridicule. This witness apparently denies that he personally wrote the latter part of the article, in which it is stated that Bohn, the lover referred to in the article, saw Gersen on the evening of the 3d, and that the latter admitted to a number of reporters "that his imagination was responsible for the facts; Gersen told him how he had evolved the scheme;" but it makes little difference whether this particular reporter wrote the article or not. Indeed, it seems to add to the malicious character of the article that it was made up and enlarged upon by some person

in the office of the defendant, other than the original writer, and after some information had been obtained showing that it was false. Surely, this statement contained in the article itself is proof that the Morning Journal knew that the whole story was a fabrication, and establishes the fact that the publication was made after notice or knowledge of its falsity; and this is prima facie evidence of malice.    In an action for libel, malice means merely the absence of a legal excuse; or, as Mr. Townshend states it in his treatise on Slander and Libel, § 75, "Acts done without lawful excuse are said to be done with malice or to be malicious acts."    Bouvier defines "malice" as the doing any act injurious to another, without just cause.    In Darry v. People, 10 N. Y. 120, 139, the court cited with approval the definition given in Bromage v. Prosser, 4 Barn. & C. 255: "'Malice,' in common acceptation, means ill will against a person; but in its legal sense it means a wrongful act done intentionally, without just cause or excuse."    Samuels v. Association, 75 N. Y. 604, was reversed by the court of appeals, on the dissenting opinion of Mr. Justice Davis, at the general term (Samuels v. Association, 9 Hun, 288), where, at page 294, it is said:

"The plaintiff in an action of libel gives evidence of malice whenever he proves the falsity of the libel.    It becomes, then, a question for the jury whether the malice is of such a character as to call for exemplary or punitive damages; and that question is not to be taken away from the jury because the defendant gives evidence which tends to show that there was, in fact, no actual malice."

The plaintiff having thus proved the publication of an article which was libelous per se, that it was false, and that the defendant had notice of its falsity, she was entitled to recover without any allegation or proof of special damage.    Upon this principle the learned justice at the trial term delivered a charge so conspicuous for its fairness that no exception was taken to it by either counsel, and the jury rendered its verdict for $3,000.

The judgment should be affirmed, with costs.    All concur.