Argued May 3, reversed and remanded August 2, 1973

# FARNSWORTH, *Appellant, v.* HYDE, *Respondent.*

512 P2d 1003

*Michael J. Bird,* Grants Pass, argued the cause for appellant. On the brief were Brown and Hughes, Grants Pass.

*Stanley C. Jones,* Klamath Falls, argued the cause for respondent. With him on the brief was J. Anthony Giacomini, Klamath Falls.

DENECKE, J.

Plaintiff alleged the defendants libeled him and sought damages. The defendant Hyde filed a demurrer to plaintiff's complaint which was sustained and upon judgment in favor of Hyde, plaintiff appealed. Dial Press, Inc., is no longer a party.

The defendant Hyde wrote a book in which he stated:

"There was a house of sorts, woman's carpentry mostly, since Al [plaintiff] was lazy.

"* * * [A]lthough a roaring fire took care of that [wind blowing through the house], as long as Mamie [plaintiff's wife] would get the wood.

"Through Mamie's industry, they built a barn and corrals for the horses and thin, pinto cattle, then dammed up the spring into a large pond so that Al could sit and watch the reflection of the day, and see the double image in its mirror calm of Mamie scooping up a bucket of water to pack up the hill.

"It was undoubtedly Mamie who dug the big root cellar into the hill * * *.

"According to him [Hyde's uncle], Al Farnsworth [plaintiff] ranked close to being the laziest

---

Bryson, J., did not participate in this opinion.

man in the world. He was always falling asleep on the mower and would end up drowsing with his team standing quietly idle somewhere off in the jackpines, where the mower had finally run into a tree too big to cut."

The sole issue on appeal is whether these statements can be considered libelous. The trial court held as a matter of law they could not.

■ The court, as distinguished from the jury, determines whether a communication is capable of a defamatory meaning. *Fowler v. Stradley,* 238 Or 606, 617, 395 P2d 867, 11 ALR3d 873 (1964), adopted 3 Restatement 304, Torts § 614, to this effect.

■ We defined a defamatory communication as one which would subject the plaintiffs "to hatred, contempt or ridicule * * * [or] tend to diminish the esteem, respect, goodwill or confidence in which each is held or to excite adverse, derogatory or unpleasant feelings or opinions against them." *Andreason v. Guard Publishing Co.,* 260 Or 308, 311, 489 P2d 944 (1971), adopting the definition from Prosser, Torts, 756 (3d ed 1964).[1]

■ American courts generally have held that a person is defamed if his reputation is tarnished among "a substantial and respectable minority" of the community or of the defamed's associates. 3 Restatement 141, Torts § 559, Comment *e.* In *Reiman v. Pac. Devel. Society,* 132 Or 82, 89, 284 P 575 (1930), we adopted the following from *Peck v. Tribune Co.,* 214 US 185, 29 S Ct 554, 53 L Ed 960, 16 Ann Cas 1075

---

[1] Prosser's 4th edition states: "* * * Defamation is rather that which tends to injure 'reputation' in the popular sense; to diminish the esteem, respect, goodwill or confidence in which the plaintiff is held, or to excite adverse, derogatory or unpleasant feelings or opinions against him. * * *." Prosser, Torts, supra at 739.

(1909), "it is enough if the publication 'obviously would hurt the plaintiff in the estimation of an important and responsible part of the community.' "

■ The words written by the defendant are capable of being interpreted to mean that plaintiff was extremely lazy, so much so that he was a poor farmer and had his wife do most of the hard work around the farm.

We hold that these words are capable of being interpreted to subject plaintiff to ridicule and diminish the esteem and respect in which plaintiff may be held by a substantial number of people in his community. We are of the opinion, particularly in a farming community, that a substantial number of plaintiff's associates might look upon their fellow with lower esteem, or perhaps with contempt, if they believed these words.[2]

There are no decisions from this jurisdiction which assist in our determination. In *Andreason v. Guard Publishing Co.,* supra (260 Or at 311), a majority of this court was of the opinion that "a statement that a husband and wife are separated and are in the process of getting a divorce would not in itself" be defamatory. We think it is apparent that the statements in the present case are in a different category.

Prosser states, generally:

"One common form of defamation is ridicule. It has been held to be defamatory to publish humorous articles, verses, cartoons or caricatures making

---

[2] We are not holding that merely stating that a person is lazy is defamatory. We are holding that it can be defamatory if embellished by all the illustrations and statements which were present in this case.

fun of the plaintiff, to heap ironical praise upon his head, to print his picture in juxtaposition with an article on evolution and a photograph of a gorilla, or with an optical illusion of an obscene and ludicrous deformity, readily detected at second glance. It is of course possible that humor may be understood by all who hear or read it as good-natured fun, not to be taken seriously or in any defamatory sense; but when it carries a sting and causes adverse rather than sympathetic or neutral merriment, it becomes defamatory. * * *." Prosser, Torts, 742-743 (4th ed 1971).

The closest case on the facts is from a New York trial court, *Pignatelli v. New York Tribune,* 117 Misc 466, 192 NYS 605 (1921). The defendant newspaper wrote:

" 'Prince Ludovic Pignatelli d'Aragon is in revolt against work. To-day it became known here that the descendant of a great house of Spain had defied his democratic father-in-law, G. Jason Waters, managing director of the Ambassador chain of hotels, and left the job' * * *." 192 NYS at 606.

In an action for libel the defendant filed the equivalent of a demurrer. The court overruled the demurrer, stating:

"* * * The American residents of this country are credited with a delicate sense of humor. To the great majority here the episode as set forth by the defendant may have made of him, as he claims, an object of ridicule to the readers of this great daily. * * *." 192 NYS at 607.

The opinion by Judge Learned Hand in *Burton v. Crowell Pub. Co.,* 82 F2d 154 (2d Cir 1936), appears in the case books as an illustration of ridicule amounting to defamation. A photograph in an ad-

vertisement made the plaintiff appear obscenely deformed. That the deformity was due to an optical illusion and was not really part of plaintiff was obvious. The court reversed a judgment that the advertisement was not capable of being construed as libelous. Judge Hand wrote:

> "* * * It would be hard for words so guarded to carry any sting, but the same is not true of caricatures, and this is an example; for, notwithstanding all we have just said, it exposed the plaintiff to overwhelming ridicule. The contrast between the drawn and serious face and the accompanying fantastic and lewd deformity was so extravagant that, though utterly unfair, it in fact made of the plaintiff a preposterously ridiculous spectacle; and the obvious mistake only added to the amusement. Had such a picture been deliberately produced, surely every right-minded person would agree that he would have had a genuine grievance; and the effect is the same whether it is deliberate or not. Such a caricature affects a man's reputation, if by that is meant his position in the minds of others; the association so established may be beyond repair; he may become known indefinitely as the absurd victim of this unhappy mischance. Literally, therefore, the injury falls within the accepted rubric; it exposes the sufferer to 'ridicule' and 'contempt.' * * *." 82 F2d at 155.

In *Powers v. Durgin-Snow Pub. Co.*, 154 Me 108, 144 A2d 294, 77 ALR2d 607 (1958), a charge of excess thriftiness was held to be defamatory. The newspaper story said of the plaintiff, Powers:

> " 'George Powers, Coating Department, is a fellow who believes in looking ahead. He's also a classic example of typical Yankee thrift. Take his idea on caskets now—George says, " 'Why spend a lot of money for a casket when, for $15 or $20 you can build one, yourself. After all, your family can

always use the money you've saved in that one item, alone.'

" 'Suiting the action to the word, George is now busily sawing and hammering away on his own tailored-to-fit coffin. And, as a sort of package deal, he's making plans to dig the space for it next.

" 'From all outward appearances, this thrifty, if slightly ghoulish gent can take his time on this project, because * * *.

" 'He turned (approximately) 35 on his last birthday.' (Innuendoes omitted)." 154 Me at 109.

The court held:

"In our view the article naturally tended to expose the plaintiff to laughter tinged with contempt, or in other words to ridicule. * * *.

"The defendant does not escape liability on the ground the article was written in jest, if such was the fact. * * *." 154 Me at 111-112.

In the 1890s when the immediate goal of the women's liberation movement was suffrage, the defendant newspaper published an article commenting:

" 'ROW, NELL! PULL, MAME!

" 'TWO GIRLS ROW A RACE FOR A BEAU WITH A HANDSOME FACE.

" 'PROSPECT PARK LAKE TURNED INTO A CUPID'S COURSE WITH A FRINGE OF FEMININITY.' "*McFadden v. Morning Journal Assn.*, 28 App Div 508 at 509, 51 NYS 275 (1898).

The story went on to state that the plaintiff, Nellie McFadden, and another girl had a rowing race to decide who would win the regard of a certain young man. In the ensuing libel action the court upheld a $3,000 verdict for plaintiff. The court virtuously wrote:

"* * * It requires hardly more than a casual

reading of the article to enable us to decide that it falls exactly within the definition of a written publication which exposes the plaintiff to contempt, ridicule and obloquy, and which causes, or tends to cause, her to be shunned or avoided. It charges her with ridiculous, immodest and forward behavior, such as no respectable girl could be guilty of without meeting the condemnation of every right-minded man and woman; and gives rise to the suggestive suspicion that the woman guilty of such behavior was loose in conduct and ready for adventure, without regard to the becoming modesty of a woman. The delineation of two young women engaged in a muscular contest for the affection of a lover might have passed current in the Middle Ages, but it is not in accordance with the more refined ideas of the Nineteenth Century, no matter what may be the woman's station in life. * * *." 28 App Div at 515.

Reversed and remanded.

McALLISTER, J., concurs in the result.