Argued and submitted March 31, reversed and remanded in part;
otherwise affirmed July 23, 1997

William R. REESMAN,
*Appellant,*

*v.*

Richard HIGHFILL
and Jim Wilson,
*Respondents,*

*and*

Jack MURRAY,
Barnard Clark and People Against
Aurora Airport Expansion,
*Defendants.*

(94C-11060; CA A92453)

942 P2d 891

David D. Park argued the cause for appellant. With him on the briefs was Elliott & Park.

Billy M. Sime argued the cause for respondent Richard Highfill, and William G. Earle argued the cause for respondent Jim Wilson. With them on the brief were Parks, Bauer, Sime and Winkler, and Hallmark, Keating & Abbott, P.C.

Before Deits, Chief Judge, and De Muniz and Haselton, Judges.

HASELTON, J.

.

.

## HASELTON, J.

Plaintiff appeals, assigning error to the entry of summary judgment against his claims for defamation and "false light" invasion of privacy. He asserts, particularly, that the trial court erred in concluding that defendants'[1] statements were not capable of defamatory meaning; that plaintiff was a public figure; and that there was no triable issue of fact as to whether defendants acted with actual malice. We generally agree with plaintiff, except that we conclude that he failed to adduce legally sufficient evidence of actual malice with respect to certain aspects of his false light claim. Accordingly, we reverse and remand for further proceedings.

Plaintiff is the sole shareholder and chief aerobatics pilot of Mig Magic, Inc., a business engaged in air show performances. Plaintiff's performances are notable in that he flies former Communist bloc aircraft.[2] Plaintiff has received local media attention because of his performances.

Between 1989 and, at least, March 1994, plaintiff kept and maintained his aircraft at the Aurora State Airport in the Aurora/Charbonneau area. Beginning in 1991, the airport was the object of controversy because of plans for expansion that had provoked the opposition of some local residents. Those residents formed an association, People Against Aurora Airport Expansion (PAAAX). Defendants were two of the four members of PAAAX's steering committee[3] and were actively involved in the association's legal efforts to stop the airport's expansion. Between the fall of 1991 and January 1994, PAAAX engaged in extensive litigation and incurred substantial unpaid attorney fees; defendants, as members of the steering committee, were personally obligated for those

---

[1] Plaintiff brought this action against five defendants: Richard Highfill, Jim Wilson, Jack Murray, Barnard Clark, and People Against Aurora Airport Expansion (PAAAX). Plaintiff subsequently settled his claims against Murray, Clark, and PAAAX and dismissed his claims against them with prejudice. Accordingly, references to "defendants" in this opinion are to Highfill and Wilson only.

[2] Before plaintiff incorporated his "Mig Magic" air show, which uses a Chinese MiG-17 jet, he had another incorporated air show, YAK ATTACK, which used two Soviet YAK-50 aircraft.

[3] The other two members were the now-dismissed defendants, Murray and Clark.

fees. Plaintiff, although aware of the airport controversy, did not participate in it.

On March 1, 1994, while plaintiff was testing a new engine in his Chinese MiG-17 in the airspace above the Aurora Airport, a fuel line broke. The jet caught fire, and plaintiff was forced to make an emergency landing at Aurora Airport. The next day, *The Oregonian* published an article regarding the incident. That article, headlined "Pilot escapes death in burning jet," included a picture of the burnt MiG and a caption that stated: "An explosion and fire rocked Bill Reesman's Chinese MiG-17 fighter Tuesday as he tried a corkscrew climb over the Aurora Airport going 300 mph." The text of the article stated, in part:

"Bill Reesman was testing a new jet engine on Tuesday, pushing his Chinese MiG-17 fighter through a corkscrew climb over the Aurora Airport when at 2,000 feet and 300 mph, he knew he was in trouble.

"With a bang and a shake, the supersonic warplane caught fire.

" 'I felt an explosion in the tail of the aircraft and the flight controls started vibrating pretty badly,' Reesman said. I knew I had very serious problems. There were 40-foot flames coming out of the left side of the fuselage.'

"* * * * *

"Even so, his only concern Tuesday afternoon had been keeping the aircraft and its full load of 400 gallons of jet fuel from hitting the surrounding hazelnut orchards and crashing on somebody's house.

"* * * * *

"After switching off the single, centrifugal-flow jet engine and opening the cockpit canopy, Reesman scrambled out, he said, and 'ran faster than any 53-year old man has ever done before.'

"In less than five minutes, 14 firefighters from Aurora Fire Department * * * started attacking the blaze with fire-suppressing foam. Reesman said he tried to stop them and warn them to get away as fast and as far as they could.

" 'I've seen those things blow up before,' he said, 'and its pretty bad.' "

On March 18, 1994, defendants published and distributed a flyer to citizens in Aurora and Charbonneau. The flyer's main purpose was to solicit contributions towards PAAAX's outstanding attorney fees of approximately $20,000. Above the flyer's text was a photocopy of *The Oregonian*'s picture of the burnt MiG and its accompanying caption and headline. The text of the flyer read:

"New developments in negotiations between PEOPLE AGAINST AURORA AIRPORT EXPANSION and the Oregon Aeronautics Div. are the cumulative result of your loyal financial support. Contributions are still urgently needed to help defray already accrued attorney's fees. They will be gratefully received by,

Jim Wilson, Treas.

* * *

"All of us are beneficiaries of our neighbor's generosity and a positive indication of our progress is the establishment of an AIRPORT ADVISORY COMMITTEE. Composed of representatives from Charbonneau and Aurora, it will receive complaints concerning noise pollution, flight path violations and act as a forum for airport actions that may impact the surrounding community.

"The Oregonian quotes the jet pilot as saying, 'I've seen these things blow up before and it's pretty bad', adding that upon scrambling out he, 'ran faster than any 53 year old man had ever run before.' He stated he was executing a 'corkscrew climb' which, under certain conditions, is definitely frowned upon by FAA authorities. Rather than commend the pilot for his impetuous candor, may we ask why YAK ATTACK, an air show company, is based at Aurora? And, why are aerial acrobatics permitted over heavily residential Charbonneau and Aurora?

"This sequence of events, not entirely unexpected by homeowners, does much to justify and explain their vigorous opposition to airport expansion and the virtual guarantee of increased jet traffic to follow.

"Recommended takeoff and landing patterns are routinely ignored by many pilots. The Jet accident indicates a potential for disaster. Had it occurred over Charbonneau or Aurora results could have been catastrophic. That it did not is only attributable to a benign providence. None of us can

be too sanguine about the environmental destruction sure to come with airport expansion.

"With thanks from your Steering Committee:

"Dick Highfill, Jack Murray, Bernie Clark, Jim Wilson"

Plaintiff brought this action, alleging claims of defamation and invasion of privacy by false light. As to the defamation claim, plaintiff alleged that the statements in the flyer "impl[ied] the existence of the following false and defamatory matters" concerning plaintiff:

"a. That the 'corkscrew climb' maneuver in which plaintiff was piloting his jet aircraft was an aerobatic maneuver prohibited by the FAA because of safety concerns, when in truth and in fact flying the plane in a corkscrew pattern, as was being done by plaintiff at the time of the accident, is a safety maneuver designed to insure the plane remains above and in close proximity to the airstrip in the event of an emergency.

"b. That plaintiff was performing aerobatic maneuvers over the populated areas of Aurora and Charbonneau, a violation of Federal Aviation Regulations for which plaintiff's pilot's license could be revoked, when in truth and in fact, plaintiff was piloting the plane in a lawful manner for purposes of testing a newly installed engine.

"c. That plaintiff is among the 'many pilots' who routinely ignore recommended takeoff and landing patterns, thereby unreasonably placing the safety of Aurora and Charbonneau homeowners at risk, when in truth and in fact plaintiff strictly observes all rules and regulations governing the safe operation of aircraft."

Plaintiff's false light claim alleged that his privacy had been invaded in the same three ways.

Defendants moved for summary judgment against both the defamation and the false light claims. As to the defamation claim, defendants raised two alternative arguments. First, the statements in their flyer were not capable of defamatory meaning. Second, plaintiff was a "public figure" for purposes of the publication, and the evidence in the summary judgment record, even when viewed most favorably to plaintiff, did not demonstrate that defendants had acted with

"actual malice." With respect to the false light claim, defendants made three alternative arguments: (1) the flyer did not concern "private facts"; (2) the flyer's statements were not "highly offensive"; and (3) the evidence was insufficient to establish that the allegedly actionable statements were made with "actual malice." Plaintiff opposed defendants' motion and also cross-moved for partial summary judgment on the "public figure" issue. The trial court granted defendants' motion and, concomitantly, denied plaintiff's cross-motion:

> "Defendants' motions are well-taken. The pleadings and the submissions make it clear that there is no genuine issue of material fact and Defendants are entitled to judgment as a matter of law. The alleged defamatory statement is not false nor capable of defamatory reading. The plaintiff is a public figure and therefore subject to the actual malice standard. There is no credible evidence that defendants acted with knowledge of any falsity nor with reckless disregard of the truth. The claim for invasion of privacy also fails for this reason. Additionally, the statement complained of is clearly not a private fact and therefore forms no actionable basis for either a showing of actual malice or false light."

On appeal, plaintiff challenges the entry of judgment against both claims. We begin with the defamation claim. Plaintiff contends that the trial court erred in each particular of its analysis, *i.e.*, in concluding that defendants' statements were not capable of defamatory meaning, that plaintiff was a public figure, and that, in all events, the evidence was insufficient to show actual malice. We consider each in turn.

In *Farnsworth v. Hyde*, 266 Or 236, 512 P2d 1003 (1973), the court defined a "defamatory communication"

> "as one which would subject the plaintiffs 'to hatred, contempt or ridicule * * * (or) tend to diminish the esteem, respect, goodwill or confidence in which each is held or to excite adverse, derogatory or unpleasant feelings or opinions against them.'" *Id.* at 238 (quoting *Andreason v. Guard Publishing Co.*, 260 Or 308, 311, 489 P2d 944 (1971)).

Plaintiff contends that defendants' flyer defamed him by, at the very least, suggesting that: (1) he had executed an aerial

maneuver "frowned upon" by the Federal Aviation Administration; (2) he had executed an aerobatic maneuver over a residential area; and (3) he had ignored recommended takeoff and landing patterns, thereby creating a safety risk. Defendants' statements, plaintiff asserts, tended to diminish his reputation in the community.

Defendants respond that the flyer's statements regarding safety concerns did not pertain specifically to plaintiff, but, instead, were merely general observations. We agree that the flyer *could* be so read, but we also agree with plaintiff that the statements, taken in context, could reasonably be read otherwise and are capable of defamatory meaning. Although the flyer never expressly states that plaintiff is an unsafe pilot, its references to unsafe flying practices are cast in the context of describing plaintiff's mishap. A jury could read the flyer as implying that plaintiff had recklessly endangered the residents of Charbonneau/Aurora through his unsafe flying and that defendants, through their opposition to airport expansion, were acting to protect the residents from plaintiff and similarly unsafe pilots. So viewed, defendants' statements would tend to "excite adverse, derogatory or unpleasant feelings or opinions" against plaintiff. *Farnsworth*, 266 Or at 238. The trial court erred in determining that the flyer's statements were not reasonably capable of defamatory meaning.

We proceed to the "public figure" issue. Under *New York Times Company v. Sullivan*, 376 US 254, 84 S Ct 710, 11 L Ed 2d 686 (1964), and its progeny, to prevail in a defamation action, a "public figure" plaintiff must prove not only that an allegedly defamatory statement was false, but also that it was made with "actual malice"—that is, "with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 279-80. In addition, the plaintiff must prove actual malice with "convincing clarity," a standard that is higher than the usual preponderance of evidence standard applied in most civil cases. *Id.* at 285-86.

Here, plaintiff asserts that the court erred in determining that he was a public figure and, consequently, in concluding that he was obligated to adduce legally sufficient evidence of actual malice with respect to the defamation

claim.[4] Plaintiff is correct. *See Wheeler v. Green,* 286 Or 99, 593 P2d 777 (1979); *see also Bank of Oregon v. Independent News,* 298 Or 434, 693 P2d 35, *cert den* 474 US 826 (1985).

In *Wheeler,* the plaintiff, a professional horse trainer, who was "well known among the public of Appaloosa racing," 286 Or at 101, and had twice been named "Trainer of the Year," by the national governing body for Appaloosa racing, brought a defamation action against his former employers. The allegedly defamatory remarks included statements in a letter that the defendants sent to the publisher of a national Appaloosa racing newsletter. The letter, which was reprinted in the newsletter, expressed defendants'

> "shock at the 'dirty tricks, lack of ethics and sportsmanship connected with the Appaloosa horse business,' stating that these practices amounted to 'extortion, bribery, forgery, intimidation, graft, corruption, fraud, income tax evasion, etc.,' and that their first step in an attempt to discourage these unethical practices had been to fire Wheeler for misconduct." *Id.* at 102.

At the time those statements were published, there was an ongoing controversy in the Appaloosa racing community concerning the sport's rules and alleged dishonest practices.

Notwithstanding that controversy, and despite the plaintiff's prominence in the national Appaloosa racing community, the court concluded that the plaintiff was not a public figure for purposes of the alleged defamatory statements and, thus, was not required to prove actual malice. *Id.* at 111-17. The fulcrum of the court's analysis was its view that, in *Gertz v. Robert Welch, Inc.,* 418 US 323, 94 S Ct 2997, 41 L Ed 2d 789 (1974), and *Time, Inc. v. Firestone,* 424 US 448, 96 S Ct 958, 47 L Ed 2d 154 (1976), the United States Supreme Court had dramatically retreated from the broad public figure formulation announced in *Curtis Publishing Co. v. Butts,* 388 US 130, 87 S Ct 1975, 18 L Ed 2d 1094 (1967). The endpoint of that evolution was the Supreme Court's conclusion in *Gertz* that

---

[4] As described below, 149 Or App at 387-88, actual malice *is* an element of plaintiff's false light claim.

"[a]bsent clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society, an individual should not be deemed a public personality for all aspects of his life. It is preferable to reduce the public-figure question to a more meaningful context by looking to the nature and extent of an individual's participation in the particular controversy giving rise to the defamation." 418 US at 352.

*See also Bank of Oregon*, 298 Or at 442 (quoting above with approval).

Based on its analysis of the Supreme Court cases, the *Wheeler* court held:

"We must conclude that under the principles now applied by the United States Supreme Court, one does not become a public figure simply because of general public interest in one's lifestyle and personal activities or because one's job happens to be one in which widespread publicity is given to outstanding performers." 286 Or at 116.

Applying that analysis, the court concluded that Wheeler was not a public figure:

"There was evidence that, because of his success as a trainer, he was very well known to that portion of the public which follows Appaloosa horse racing. There was also evidence that there was, among those engaged in and interested in that sport, a current controversy about the adequacy of the rules and practices governing that sport, and the potential for abuse and dishonest activity. *There was, however, no evidence that plaintiff had attempted in any way to influence that controversy or that he had taken any public part in it whatsoever.* Until the statements by defendants which are the subject of this case were made public, the only publicity which plaintiff had received, so far as the record shows, was attributable solely to and concerned only his success as a trainer. There was no showing that he had voluntarily engaged in any activities of the kind the Court indicated in *Gertz* and *Firestone* were significant, nor had he been drawn into any public controversy." *Id.* at 116-17 (emphasis supplied).

In *Bank of Oregon*, the court employed a similar analysis in holding that the plaintiff banking corporation and

its president were not public figures with respect to published accusations that they had wrongfully diverted one customer's money and credit to another:

> "Those cases cited by defendants and amici which hold a business entity to be a public figure based on analysis of a thrusting into the vortex of a public controversy are inapposite. There simply is no public controversy into which plaintiffs arguably thrust themselves. Merely opening one's doors to the public, offering stock for public sale, advertising, etc., even if considered a thrusting of one's self into matters of public interest, is not sufficient to establish that a corporation is a public figure." 298 Or at 443 (citations omitted).

■     No subsequent Oregon Supreme Court decision has revisited and materially revised the *Wheeler/Bank of Oregon* public figure analysis. Nor has the United States Supreme Court altered its precedents that underlie that analysis. *See, e.g., Wolston v. Reader's Digest Assn., Inc.*, 443 US 157, 163-65, 99 S Ct 2701, 61 L Ed 2d 450 (1979) (reiterating analysis). Accordingly, in determining whether plaintiff is a public figure with respect to defendants' statements, we apply *Wheeler*'s construction of federal authority. Under that formulation, plaintiff could be a public figure only if: (1) he was an "all-purpose" public figure, *i.e.*, a "public figure for all purposes and in all contexts," *Gertz*, 418 US at 351; or (2) he had "thrust [himself] to the forefront of [a] particular public controvers[y] in order to influence the resolution of the issues involved." *Id.* at 345. Here, defendants do not, and cannot, contend that plaintiff is an "all-purpose" public figure.[5] Accordingly, we consider only "limited public figure" status.

Defendants assert that plaintiff is a limited public figure by virtue of his involvement with either or both of two controversies: the Aurora Airport expansion dispute and the March 1, 1994, aircraft fire and emergency landing at an airport in a heavily populated area. We reject both arguments.

■     On this record, it is uncontroverted that plaintiff did not actively and publicly participate in the Aurora Airport

---

[5] Notable examples of such figures might include Muhammad Ali, Michael Jordan, and Madonna. *See* Rodney A. Smolla, *Law of Defamation* § 2.23 (1986 and 1995 supp) (giving examples).

expansion controversy. That is, "[t]here was, however, no evidence that plaintiff had attempted in any way to influence that controversy or that he had taken any public part in it whatsoever." *Wheeler*, 286 Or at 116. *Defendants'* efforts to interject plaintiff into the public dispute, by using his mishap as a "hook" for their fund-raising efforts, could not transmute him into a public figure. *See, e.g., Firestone, Gertz, Wheeler*.

■     Nor was plaintiff a limited public figure with respect to the accident. Landing a flaming airplane—much less, a vintage airplane—in the middle of a heavily populated area is, doubtless, a matter of considerable public interest. Nevertheless,

> "[a] private individual is not automatically transformed into a public figure just by becoming involved in or associated with a matter that attracts public attention. * * * A libel defendant must show more than mere newsworthiness to justify application of the demanding burden of *New York Times*." *Wolston*, 443 US at 167-68.

Here, plaintiff's involvement in the accident was, to say the least, involuntary. There is no suggestion that he intentionally "crash-landed" his flaming plane for some ulterior publicity-seeking purpose. Rather, plaintiff was the quintessential involuntary participant in a newsworthy event.

Defendants contend, nevertheless, that plaintiff was a limited public figure with respect to the accident because he was an entertainer—an aerobatic performer—who, before the accident, voluntarily publicized his flying skills and performances. The summary judgment record includes, as exhibits, a promotional handbill that plaintiff apparently sent to air show organizers, an advertisement that he placed in a trade magazine, and several regional newspaper articles describing plaintiff and his performances. Based on that evidence, defendants argue that plaintiff purposefully interjected his flying business into the public domain and invited public comment, not only on his performances, but also on related matters, including preparation and practice. As support for that position, defendants point to several cases treating local entertainers or performers as limited "regional public figures." *See, e.g., Chuy v. Philadelphia Eagles Football Club*, 595 F2d 1265 (3rd Cir 1979) (professional football

player was a public figure for purposes of all matters that were related to his football playing, including his health, which was the subject of the alleged defamatory publication).[6]

Defendants' argument fails for at least two reasons. First, whatever the scope and vitality of the "performer as public figure" equation in other jurisdictions,[7] our Supreme Court in *Wheeler* expressly disapproved *Chuy* "because [it does] not, in our opinion, accurately assess the present position of the United States Supreme Court." 286 Or at 116. Second, although the newspaper coverage of plaintiff's performances demonstrates that his work "happens to be one in which widespread publicity is given to outstanding performers," *id.*, that is not enough here—as it was not enough in *Wheeler*—to render the recipient a limited public figure. Here, as in *Wheeler*, there is no evidence that plaintiff purposely created a public controversy or voluntarily interjected himself into such a controversy.

We thus conclude that plaintiff was not a public figure with respect to the events that were the subject of defendants' statements. Consequently, we reverse and remand the defamation claim as to both defendants.[8]

We proceed, then, to the false light claim. The trial court granted summary judgment against that claim on two grounds: (1) the statements complained of did not pertain to

---

[6] *See also Bell v. Associated Press*, 584 F Supp 128 (DC 1984) (publication stating that a professional football player was arrested for lewdness was subject to the actual malice standard, because of professional football's prominence in society and the fact that football's success relies, in part, on public respect; player's personal activities that could potentially harm that respect were thus tied to his football playing); *James v. Gannett Co., Inc.*, 40 NY2d 415, 386 NYS 2d 871, 353 NE2d 834 (NY Ct App 1976) (belly dancer who had cooperated in an interview with a reporter, and whose purpose in allowing the interview was to attract customers to the club where she was performing, was a public figure). *Cf. Braun v. Flynt*, 726 F2d 245 (5th Cir) (female entertainer who worked in an amusement park novelty act, who was not in charge of her own publicity, and whose public exposure was limited to the carnival act and a picture postcard of her act, was not a public figure), *cert den* 469 US 883 (1984)

[7] *See generally* Smolla, *Law of Defamation* § 2.21[4][b], [5] (describing case law involving "less famous entertainers" and sports personalities).

[8] Our analysis obviates any consideration of actual malice with respect to defamation. That issue is, however, material to the false light claim, and we address it below in that context.

"private facts"; and (2) there was "no credible evidence" that defendants acted with actual malice. Defendants now concede—and properly so—that the disclosure of private facts is not an element of a false light invasion of privacy claim under Oregon law. *See Dean v. Guard Publishing Co.*, 73 Or App 656, 658-59, 699 P2d 1158 (1985) (adopting elements set out in *Restatement (Second) of Torts* § 652E (1977)).[9] Defendants argue, however, that summary judgment was nevertheless appropriate, because actual malice is an element of false light, and that, even viewing the evidence most favorably to plaintiff, the summary judgment record did not demonstrate that defendants had acted with actual malice.

■      Defendants are correct that, under our precedents, to ultimately prevail on a false light claim, a plaintiff must prove that the defendant had "knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which [the plaintiff] would be placed." *Dean*, 73 Or App at 659 (*quoting Restatement (Second) of Torts* § 652E(b)). *See also McNabb v. Oregonian Publishing Co.*, 69 Or App 136, 140-43, 685 P2d 458, *rev den* 297 Or 824 (1984), *cert den* 469 US 1216 (1985).[10] Given our analysis in *Dean*

---

[9] Compare Smolla, *Law of Defamation* § 10.04[1]:

"Whereas defamation and false light invasion of privacy both are triggered by the publication of *false* statements, the privacy tort known as 'publication of private facts' (or publication of 'embarrassing' facts) involves publication of *true facts* that the common law regards as private, and essentially nobody else's business." (Emphasis in original.)

[10] In *Dean*, we noted that it was "unclear" whether the *Restatement* standard, which was derived from *Time, Inc. v. Hill*, 385 US 374, 87 S Ct 534, 17 L Ed 2d 456 (1967), remained the "constitutionally required standard in the light of the United States Supreme Court's holding that a comparable libel standard is not constitutionally required for a plaintiff, who is not a public figure or public official, who sues a media defendant." We concluded, however, that, because we had previously adhered to the *Restatement* test, that test "is controlling in Oregon until there is a clear change in federal constitutional law." 73 Or App at 660 n 4.

The state of federal constitutional law on this issue is no clearer today than it was when *Dean* was decided in 1985. Indeed, there remains a deep "division of authority on the question of whether the *Gertz* ruling permits states to impose liability for false light invasion of privacy in private figure cases on a showing of mere negligence, rather than actual malice. There is now substantial authority on both sides of the issue." Smolla, *Law of Defamation* § 10.02[3][b], at 10-11. *Accord Cantrell v. Forest City Publishing Co.*, 419 US 245, 250, 95 S Ct 465, 42 L Ed 2d 419 (1974) ("[T]his case presents no occasion to consider whether a State may constitutionally apply a more relaxed standard of liability for a publisher or broadcaster of false statements injurious to a private individual under a false-light theory of

and *McNabb*, "actual malice" has the same content in both false light and defamation claims. *See, e.g., McNabb*, 69 Or App at 140-41, 143. In *McNabb*, we amplified that element:

"Malice may be established by evidence that a statement was published 'with knowledge that it was false or with reckless disregard of whether it was false or not,' or 'with [a] high degree of awareness of [its] probable falsity,' or when 'the defendant in fact entertained serious doubts as to the truth of [its] publication.'" *Id.* at 140 (citations omitted; brackets in original).

*See also Lonsdale v. Swart*, 143 Or App 331, 338-40, 922 P2d 1263 (1996), *rev den* 325 Or 247 (1997) (reiterating and applying *McNabb*'s synthesis of actual malice standard).

Before testing the summary judgment record against the *McNabb* standard, we must pause and clarify a procedural point pertaining to summary judgment practice and our review. Before the trial court, the parties and the court adhered to, and framed their analysis in terms of, the summary judgment methodology announced in *Jones v. General Motors Corp.*, 139 Or App 244, 911 P2d 1243 (1996) *aff'd* 325 Or 404, 939 P2d 608 (1997). On appeal, the parties continued to frame their argument in the terms dictated by our *Jones* holding—*i.e.*, had plaintiff, as the party bearing the ultimate (trial) burden of proof on actual malice, adduced *prima facie* evidence of actual malice? Very recently, and after oral argument in this case, the Supreme Court in *Jones v. General Motors Corp.*, 325 Or 404, 939 P2d 608 (1997), expressly reiterated that the applicable standard for reviewing summary judgments is that announced in *Seeborg v. General Motors Corp.*, 284 Or 695, 588 P2d 1100 (1978):

"The moving party has the burden of showing that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law. The record on summary judgment is viewed in the light most favorable to the party opposing the motion. This is true even as to those issues upon which the opposing party would have the trial burden." 284 Or at 699 (citations omitted).

---

invasion of privacy, or whether the constitutional standard announced in *Time, Inc. v. Hill* applies to all false-light cases.").

*See Jones*, 325 Or at 415 ("[T]he amendment, by its terms, does not alter the quantum of proof required to support or oppose a motion for summary judgment, shift any evidentiary burden to either party, or modify the standard that governs the court's decision on a motion for summary judgment.").

In this case, the distinction between our repudiated approach in *Jones* and the *Seeborg* standard, as reiterated by the Supreme Court in *Jones*, is ultimately immaterial. That is so because, as described below, defendants, in moving for summary judgment, proffered affirmative evidence that they had not acted with actual malice. Thus, even under *Seeborg*, unless that *prima facie* evidence disproving an essential element of plaintiff's claim was controverted, defendants would be entitled to summary judgment.

Our inquiry narrows, then, to whether defendants' disavowals of actual malice were, in fact, materially controverted with respect to the three allegedly actionable statements. As described below, we conclude that there were, indeed, disputed issues of fact as to some, but not all, specifications of the false light claim.

In moving for summary judgment, both defendants submitted affidavits generally disavowing actual malice. Defendant Highfill, in his affidavit, stated that he "thought the flyer pretty much was a duplication of the Oregonian article"; that he did not recall anyone, including defendant Wilson, expressing concern that any of the flyer's statements were false or might place plaintiff in a false or unfair light; and that he did not know, or have reason to know, that any statement in the flyer was false or placed plaintiff in an unfair light. Wilson filed a similar affidavit, stating that, at the time of publication, he believed that all of the statements were true and that he had no reason to believe that they were false: "I had read the newspaper article and reasonably relied on input from other people to verify the truth or accuracy of the flyer." We address the evidence as to each allegedly actionable statement, in turn, to determine if defendants' disavowals of actual malice were, in fact, materially uncontroverted.

■ The first statement was that plaintiff was executing a " 'corkscrew climb,' which, under certain conditions, is definitely frowned upon by FAA authorities." Plaintiff argues, *inter alia*, that, regardless of defendants' affidavits, in their depositions they gave ostensibly contradictory accounts of the genesis of the "frowned upon" statement, as well as of their respective understandings of its meaning. Plaintiff further asserts that: (1) a trier of fact could reasonably infer from those alleged contradictions that either or both of the defendants were untruthful; (2) that lack of credibility could, in turn, support a reasonable inference that either or both of the defendants "actually had a high degree of awareness that the statement[ ] probably [was] false or that [defendants] actually entertained serious doubts as to the truth of" the statement, *Lonsdale*, 143 Or App at 339; and (3) that inference was further reasonably buttressed by defendants' monetary motive in publishing the flyer, *i.e.*, their personal liability for PAAAX's outstanding attorney fees. Thus, plaintiff asserts, there was a disputed issue of material fact as to actual malice with respect to the "frowned upon" statement.

We agree. Without dwelling unnecessarily on the details of defendants' deposition testimony, we believe that a trier of fact could, but need not, view defendants' statements as contradictory in material respects and could, but need not, reasonably draw the other inculpatory inferences plaintiff posits. Thus, there were disputed issues of material fact as to whether either or both defendants acted with actual malice with respect to the first, "definitely frowned upon by the FAA" statement.

■ The second allegedly actionable statement read, "[W]hy are aerial acrobatics permitted over heavily residential Charbonneau and Aurora?" In context, that "rhetorical" question may reasonably be read as suggesting that plaintiff had engaged in aerobatic maneuvers over heavily populated areas. However, unlike with respect to the first, "frowned upon" statement, plaintiff has identified no evidence controverting defendants' disavowals of actual malice with respect to the second. In particular, we perceive no material contradiction between, or within, defendants' deposition testimony, of the sort underlying our analysis of the first statement, that would permit a finding of actual malice as to the second.

■ ■ Finally, we consider the third allegedly actionable statement: "Recommended takeoff and landing procedures are routinely ignored by many pilots." In the context of the entire flyer, which highlighted plaintiff's mishap, the ostensibly generic reference to "many pilots" could be reasonably understood to include, and refer to, plaintiff specifically, placing plaintiff in a false light. With respect to Wilson, we conclude that his disavowals of actual malice are uncontroverted with respect to the third statement. There is no contradicting evidence in the summary judgment record from which one could infer that Wilson either had a high degree of awareness that that statement was probably false or actually entertained serious doubts as to the truth of that statement. There is, however, a material factual dispute as to whether Highfill acted with actual malice in publishing the third statement. In particular, Highfill testified that, some time before the accident, plaintiff had contacted him to discuss which takeoff and landing patterns would best reduce noise around the airport. Plaintiff subsequently tried different patterns and called Highfill to see which patterns were less noisy. From that evidence, a trier of fact could reasonably infer that Highfill, knowing of plaintiff's previous concerns regarding takeoff and landing patterns, seriously doubted the truth of the third statement but nevertheless published it because of an ulterior monetary motive.

In sum, there are disputed issues of material fact as to both defendants' actual malice with respect to some specifications of the false light claim. Accordingly, the trial court erred in granting summary judgment against that claim in its entirety.

Reversed and remanded on plaintiff's defamation claim; on plaintiff's false light claim, reversed as to Highfill and Wilson on first statement; reversed as to Highfill on third statement; otherwise affirmed.