Argued and submitted May 4, decision of Court of Appeals reversed, judgment of circuit court affirmed October 29, 1998

William R. REESMAN,
*Respondent on Review,*

*v.*

Richard HIGHFILL
and Jim Wilson,
*Petitioners on Review,*

*and*

Jack MURRAY,
Barnard Clark and
People Against Aurora Airport Expansion,
*Defendants.*

(CC 94C-11060; CA A92453; SC S44639)

965 P2d 1030

Keith J. Bauer, of Parks, Bauer, Sime & Winkler LLP, Salem, argued the cause for petitioner on review Richard Highfill. With him on the petition was Billy M. Sime.

William Earle, of Abbott, Davis, Rothwell, Mullin & Earle, PC, Portland, argued the cause for petitioner on review Jim Wilson. With him on the petition was Alan Gladstone.

David D. Park, of Elliot & Park, Portland, argued the cause for respondent on review.

Before Carson, Chief Justice, and Gillette, Van Hoomissen, Durham, Kulongoski, and Leeson, Justices.

LEESON, J.

**LEESON, J.**

Plaintiff William Reesman brought this action for defamation and invasion of privacy by false light after defendants[1] printed and distributed a flyer between March 11 and March 17, 1994, on behalf of the organization People Against Aurora Airport Expansion (PAAAX). The circuit court entered summary judgment for defendants. Plaintiff appealed, and the Court of Appeals reversed. *Reesman v. Highfill*, 149 Or App 374, 942 P2d 891 (1997). For the reasons that follow, we reverse the decision of the Court of Appeals and affirm the judgment of the circuit court.

## FACTS

The facts, as reported by the Court of Appeals, are uncontested:

"Plaintiff is the sole shareholder and chief aerobatics pilot of Mig Magic, Inc., a business engaged in air show performances. Plaintiff's performances are notable in that he flies former Communist bloc aircraft. Plaintiff has received local media attention because of his performances.

"Between 1989 and, at least, March 1994, plaintiff kept and maintained his aircraft at the Aurora State Airport in the Aurora/Charbonneau area. Beginning in 1991, the airport was the object of controversy because of plans for expansion that had provoked the opposition of some local residents. Those residents formed an association, [PAAAX]. Defendants were two of the four members of PAAAX's steering committee and were actively involved in the association's legal efforts to stop the airport's expansion. Between the fall of 1991 and January 1994, PAAAX engaged in extensive litigation and incurred substantial unpaid attorney fees; defendants, as members of the steering committee, were personally obligated for those fees. Plaintiff, although aware of the airport controversy, did not participate in it.

---

[1] The defendants originally were Richard Highfill, Jim Wilson, Jack Murray, Barnard Clark, and People Against Aurora Airport Expansion (PAAAX). Plaintiff settled his claims against Murray, Clark, and PAAAX, and those claims were dismissed with prejudice. In this opinion, "defendants" refers to Highfill and Wilson.

"On March 1, 1994, while plaintiff was testing a new engine in his Chinese MiG-17 in the airspace above the Aurora Airport, a fuel line broke. The jet caught fire, and plaintiff was forced to make an emergency landing at Aurora Airport. The next day, *The Oregonian* published an article regarding the incident. That article, headlined 'Pilot escapes death in burning jet,' included a picture of the burnt MiG and a caption that stated: 'An explosion and fire rocked Bill Reesman's Chinese MiG-17 fighter Tuesday as he tried a corkscrew climb over the Aurora Airport going 300 mph.' The text of the article stated, in part:

" 'Bill Reesman was testing a new jet engine on Tuesday, pushing his Chinese MiG-17 fighter through a corkscrew climb over the Aurora Airport when at 2,000 feet and 300 mph, he knew he was in trouble.

" 'With a bang and a shake, the supersonic warplane caught fire.

" ' "I felt an explosion in the tail of the aircraft and the flight controls started vibrating pretty badly," Reesman said. ["]I knew I had very serious problems. There were 40-foot flames coming out of the left side of the fuselage."

" '* * * * *

" 'Even so, his only concern Tuesday afternoon had been keeping the aircraft and its full load of 400 gallons of jet fuel from hitting the surrounding hazelnut orchards and crashing on somebody's house.

" '* * * * *

" 'After switching off the single, centrifugal-flow jet engine and opening the cockpit canopy, Reesman scrambled out, he said, and "ran faster than any 53-year old man has ever done before."

" 'In less than five minutes, 14 firefighters from Aurora Fire Department * * * started attacking the blaze with fire-suppressing foam. Reesman said he tried to stop them and warn them to get away as fast and as far as they could.

" ' "I've seen those things blow up before," he said, "and [it's] pretty bad." '

"On March 18, 1994, defendants published and distributed a flyer to citizens in Aurora and Charbonneau. The flyer's main purpose was to solicit contributions towards

PAAAX's outstanding attorney fees of approximately $20,000. Above the flyer's text was a photocopy of *The Oregonian*'s picture of the burnt MiG and its accompanying caption and headline. The text of the flyer read:

" 'New developments in negotiations between [PAAAX] and the Oregon Aeronautics Div. are the cumulative result of your loyal financial support. Contributions are still urgently needed to help defray already accrued attorney's fees. They will be gratefully received by,

Jim Wilson, Treas.
\* \* \*

" 'All of us are beneficiaries of our neighbor's generosity and a positive indication of our progress is the establishment of an AIRPORT ADVISORY COMMITTEE. Composed of representatives from Charbonneau and Aurora, it will receive complaints concerning noise pollution, flight path violations and act as a forum for airport actions that may impact the surrounding community.

" 'The Oregonian quotes the jet pilot as saying, "I've seen these things blow up before and it's pretty bad", adding that upon scrambling out he, "ran faster than any 53 year old man had ever run before." He stated he was executing a "corkscrew climb" *which, under certain conditions, is definitely frowned upon by FAA [Federal Aeronautics Administration] authorities*. Rather than commend the pilot for his *impetuous candor*, may we ask why YAK ATTACK, an air show company, is based at Aurora? And, *why are aerial acrobatics permitted over heavily residential Charbonneau and Aurora*?

" 'This sequence of events, not entirely unexpected by homeowners, does much to justify and explain their vigorous opposition to airport expansion and the virtual guarantee of increased jet traffic to follow.

" '*Recommended takeoff and landing patterns are routinely ignored by many pilots*. The Jet accident indicates a potential for disaster. Had it occurred over Charbonneau or Aurora results could have been catastrophic. *That it did not is only attributable to a benign providence*. None of us can be too sanguine about the environmental destruction sure to come with airport expansion.

" 'With thanks from your Steering Committee:

" 'Dick Highfill, Jack Murray, Bernie Clark, Jim Wilson' "
*Reesman,* 149 Or App at 376-79 (footnotes omitted; emphasis added).

Plaintiff's complaint alleged that the emphasized statements in the flyer, taken in the context in which they appear, "imply the existence of the following false and defamatory matters" concerning him:

"a. That the 'corkscrew climb' maneuver in which plaintiff was piloting his jet aircraft was an aerobatic maneuver *prohibited* by the FAA because of safety concerns, when in truth and in fact flying the plane in a corkscrew pattern, as was being done by plaintiff at the time of the accident, is a safety maneuver designed to insure the plane remains above and in close proximity to the airstrip in the event of an emergency.

"b. That plaintiff was performing aerobatic maneuvers over the populated areas of Aurora and Charbonneau, *a violation of Federal Aviation Regulations* for which plaintiff's pilot's license could be revoked, when in truth and in fact, plaintiff was piloting the plane in a lawful manner for purposes of testing a newly installed engine.

"c. That *plaintiff is among the 'many pilots' who routinely ignore recommended takeoff and landing patterns,* thereby unreasonably placing the safety of Aurora and Charbonneau homeowners at risk, when in truth and in fact plaintiff strictly observes all rules and regulations governing the safe operation of aircraft." (Emphasis added.)

According to plaintiff, those implications portray him as an unsafe pilot who "presents an unreasonable risk of harm to the neighboring community." Plaintiff's complaint also alleged that the same implications placed him in a false light that was highly offensive to him and would be highly offensive to a reasonable person.

Defendants responded that plaintiff had failed to state a claim for relief and, as an affirmative defense, alleged that plaintiff was a public figure and that there was no triable issue of fact about whether defendants acted with actual malice. Defendants moved for summary judgment on plaintiff's defamation and invasion of privacy claims; plaintiff filed a cross-motion for partial summary judgment on defendants'

public figure affirmative defense. The circuit court granted each of defendants' motions and denied plaintiff's motion, reasoning that "[t]he pleadings and the submissions make it clear that there is no genuine issue of material fact and Defendants are entitled to judgment as a matter of law."

On plaintiff's defamation claim, the Court of Appeals reversed, holding that the three statements were capable of defamatory meaning because, although they could be read as making "merely general observations" that did not pertain specifically to plaintiff, "the statements, taken in context, could reasonably be read otherwise and are capable of defamatory meaning." *Reesman*, 149 Or App at 381. The court also held that plaintiff was neither a public figure nor a limited public figure. *Id.* at 384. On plaintiff's invasion of privacy claim, the court held that summary judgment on the entire claim was error, because there were disputed issues of material fact as to whether defendants acted with "actual malice" as to some, but not all, of plaintiff's allegations. *Id.* at 390-91. The court reversed summary judgment for both defendants on the first statement and reversed as to Highfill on the third statement.

We view the evidence that was before the circuit court on summary judgment, and all reasonable inferences to be drawn from it, in the light most favorable to plaintiff, the nonmoving party. *Jones v. General Motors Corp.*, 325 Or 404, 420, 939 P2d 608 (1997). For the reasons that follow, we reverse the decision of the Court of Appeals and affirm the judgment of the circuit court.

## DEFAMATION

A defamatory communication is one that would subject another to

" '* * * hatred, contempt or ridicule * * * [or] tend to diminish the esteem, respect, goodwill or confidence in which [the other] is held or to excite adverse, derogatory or unpleasant feelings or opinions against [the other].' " *King v. Menolascino*, 276 Or 501, 504, 555 P2d 442 (1976) (quoting *Farnsworth v. Hyde*, 266 Or 236, 238, 512 P2d 1003 (1973)).

To be actionable, a communication must be both false and defamatory. *Harley-Davidson v. Markley*, 279 Or 361, 364,

568 P2d 1359 (1977). The court, rather than the jury, determines whether a communication is capable of a defamatory meaning. *King*, 276 Or at 504. In making that determination, the court looks to the context in which the communication was made. *Ibid.* A communication can be defamatory on its face. *Andreason v. Guard Publishing Co.*, 260 Or 308, 310-11, 489 P2d 944 (1971). Even a communication that is not defamatory on its face may be defamatory if a reasonable person could draw a defamatory inference from the communication. *King*, 276 Or at 504.

■ Defamation by implication is the label commonly given to a claim that requires drawing a defamatory inference from a facially nondefamatory communication. *See* Rodney A. Smolla, *Law of Defamation* § G13 4.05 (1986 and 1997 supp) (describing tort). When defamation by implication is alleged, this court has held that the link between the communication and the defamatory inference must not be "too tenuous." *King*, 276 Or at 504; *see also Andreason*, 260 Or at 312 (if external circumstances could make it possible to draw a connection between a statement and a defamatory inference, the connection must not be "too tenuous"). In other words, when a claim for defamation requires the drawing of a defamatory inference, the inference that the plaintiff seeks to draw from the facially nondefamatory communication must be reasonable. *See King*, 276 Or at 504 (not reasonable to infer that the plaintiff was a liar and promoter of unworthy causes from words or context of the defendants' letters to the editor).

As explained above, plaintiff did not allege that any of the statements in the flyer themselves were false and defamatory. Rather, he contended that particular assertions in the flyer, emphasized earlier and discussed below, "imply the existence of * * * false and defamatory matters."

■ The first statement concerns the corkscrew climb that plaintiff was executing while testing the new engine in his MiG jet on the day of the accident. The flyer refers to the " 'corkscrew climb' which, under certain conditions, is definitely frowned upon by FAA authorities." According to plaintiff, that statement implies that a corkscrew climb is *"prohibited* by the FAA because of safety concerns," (emphasis

added), and portrays plaintiff as an unsafe pilot. The question is whether the context in which the statement appears creates a reasonable implication that the corkscrew climb is prohibited and that plaintiff was flying in violation of FAA regulations on the day of the accident.

The statement that the FAA frowns on the use of the corkscrew climb under certain conditions is the second sentence of the paragraph in which it appears. The first sentence of that paragraph quotes what plaintiff said to a reporter for *The Oregonian* after the accident, namely, that when jet airplanes blow up, "it's pretty bad." The statement that plaintiff claims supports a defamatory inference does not declare under what conditions the FAA frowns on the use of the corkscrew climb, and nothing in the flyer indicates what such conditions might be. To the contrary, the last sentence of the paragraph in which the statement appears declares that aerial acrobatic maneuvers are *permitted* over the area in which the accident occurred. Even assuming that the corkscrew climb that plaintiff was executing when the accident occurred was an aerial acrobatic maneuver, the flyer makes it clear that such a maneuver is permitted, not prohibited. And, even if the statement to which plaintiff objects could be read to imply that the FAA frowns on the use of the corkscrew climb when a pilot is testing a new engine, such an assertion does not support the implication that the FAA prohibits pilots from making corkscrew climbs. The context in which the statement appears thus does not create a reasonable link between the statement that the FAA frowns on the corkscrew climb under certain conditions and the implication that the FAA prohibits the corkscrew climb.

Plaintiff's complaint next alleged that the third and fourth sentences of the same paragraph also contain defamatory implications. The statements to which he objects are the reference to plaintiff's "impetuous candor" when talking to the newspaper reporter and the question, "[W]hy are aerial acrobatics permitted over heavily residential Charbonneau and Aurora?" According to plaintiff, the reference to his "impetuous candor" and the question about why aerial acrobatics are permitted imply that, on the day of the accident, he was flying his airplane in "violation of Federal Aviation Regulations for which [his] pilot's license could be revoked."

Nothing in those statements supports the implication that plaintiff suggests. More significantly, those statements are expressions of opinion. Such statements, which cannot be interpreted reasonably as stating actual facts, are not actionable because they are constitutionally protected. *See Milkovich v. Lorain Journal Co.*, 497 US 1, 20, 110 S Ct 2695, 111 L Ed 2d 1 (1990) (statement of opinion relating to matters of public concern that do not contain a provably false factual connotation will receive full constitutional protection).

■ We turn to the final statements in the flyer that plaintiff contends contain a defamatory inference. Those statements appear in the last paragraph of the flyer: "Recommended takeoff and landing patterns are routinely ignored by many pilots," and only a "benign providence" prevented plaintiff's accident from occurring over the heavily populated areas of Charbonneau and Aurora. According to plaintiff, those statements imply that he is one of the many pilots who routinely ignore recommended takeoff and landing patterns, thereby unreasonably placing at risk the safety of homes in Charbonneau and Aurora.

The statement that "many pilots" routinely ignore recommended takeoff and landing patterns does not declare that plaintiff is one of those pilots. Neither does the statement declare that plaintiff did anything on the day of the accident to place the Charbonneau or Aurora areas at risk. The flyer refers to plaintiff's accident as a recent example of the potentially disastrous consequences of an airplane accident and states that such a disaster was averted on the day of plaintiff's accident only by "a benign providence." Those assertions reflect the authors' concern that, if the Aurora Airport expands, the potential for accidents will increase because many pilots ignore recommended takeoff and landing patterns. Nothing in the flyer supports the implication that plaintiff is among the "many pilots" who routinely ignore recommended takeoff and landing patterns.

In sum, we conclude that the circuit court did not err in granting defendants' motion for summary judgment on plaintiff's claim for defamation.[2]

---

[2] In light of our disposition, we need not address defendants' argument that plaintiff is a public figure because he actively seeks publicity for his air shows. *See*

## INVASION OF PRIVACY BY FALSE LIGHT

█    Plaintiff's complaint for invasion of privacy by false light also alleged that the statements discussed above imply that the corkscrew climb is prohibited by the FAA because of safety concerns, that plaintiff was performing aerobatic maneuvers over Aurora and Charbonneau on the day of the accident in violation of FAA regulations, and that plaintiff is among the "many pilots" who routinely ignore recommended takeoff and landing patterns. According to plaintiff, those implied statements placed his "conduct, skill, safety and responsibility as a pilot before the public in a false light" that was highly offensive to him and would be to a reasonable person.

This court previously has not recognized the tort of invasion of privacy by false light.[3] As we explain below, we need not decide in this case whether to do so because, even if that tort is available in Oregon, plaintiff has failed to allege it here.

The *Restatement (Second) of Torts* § 652A (1977) identifies four types of invasion of privacy claims, including "false light." *See also Time, Inc. v. Hill*, 385 US 374, 87 S Ct 534, 17 L Ed 2d 456 (1967) (describing framework for tort now labeled "invasion of privacy by false light"). Section 652E of the *Restatement (Second) of Torts* provides:

"One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if

"(a)   the false light in which the other was placed would be highly offensive to a reasonable person, and

*Wheeler v. Green*, 286 Or 99, 116, 593 P2d 777 (1979) (a person does not become a public figure merely because "one's job happens to be one in which widespread publicity is given to outstanding performers"). Neither need we consider defendants' argument that plaintiff failed to demonstrate, by clear and convincing evidence, that defendants acted with actual malice.

[3] For over a decade, however, the Court of Appeals has held that a person who places another in a false light may be liable for resulting damages. *Dean v. Guard Publishing Co.*, 73 Or App 656, 659, 699 P2d 1158 (1985).

"(b)   the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed."

The tort of invasion of privacy by false light is like the tort of defamation, in that it leads others to believe something about a person that is not true. However, the primary injury in a defamation claim is damage to a person's reputation, while the primary injury in a false-light claim is the mental distress or anguish that a person suffers because the "false light" that is cast by a communication is highly offensive. *See Lerman v. Flynt Distributing Co., Inc.*, 745 F2d 123, 135 (2d Cir 1984) (describing tort).

As explained above, plaintiff's complaint alleged only that the statements to which he objects *imply* statements that would lead others to believe something about him that is not true. Even assuming that there could be circumstances in which implied statements could form the basis for a claim of invasion of privacy by false light,[4] we have explained above that, in this case, there are no reasonable links between the statements in the flyer and the implied statements that plaintiff contends place him in a false light. *See Partington v. Bugliosi*, 56 F3d 1147, 1160 (9th Cir 1995) (reasons for rejecting defamation claim provide basis for also rejecting false-light claim). Therefore, the circuit court did not err in granting defendants' motion for summary judgment on plaintiff's invasion of privacy claim.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is affirmed.

---

[4] Courts are divided about whether a plaintiff can state a claim for invasion of privacy by false light when doing so requires the drawing of inferences. *Compare Machleder v. Diaz*, 801 F2d 46, 54-55 (2d Cir 1986) (in order not to interfere with editorial discretion, only literal falsity should be actionable) *with Godbehere v. Phoenix Newspapers, Inc.*, 162 Ariz 335, 341, 783 P2d 781, 787 (Ariz 1989) (a plaintiff may bring invasion of privacy by false-light claims even though publication is not defamatory and even though actual facts stated are true).