Argued and submitted May 7, judgment on plaintiffs' first, second, and third claims reversed and remanded; order quashing subpoena reversed; otherwise affirmed October 13, 2004, petition for review allowed February 15, 2005 (338 Or 124)

Timothy M. BROWN, M.D.,
and Timothy M. Brown, M.D., P.C.,
an Oregon professional corporation,
*Appellants,*

*v.*

Daniel J. GATTI;
Gatti, Gatti, Maier, Krueger & Associates,
an Oregon partnership;
Gatti, Gatti, Maier, Krueger, Sayer & Associates,
an Oregon partnership;
Gatti & Gatti, P.C.,
an Oregon professional corporation,
*Respondents,*

*and*

Marie NOLAN
and Jane Does 1-5,
*Defendants,*
*and*

OREGON PUBLISHING COMPANY
and David R. Anderson,
*Intervenors-respondents.*

0002 01586; A115927

99 P3d 299

Montgomery W. Cobb argued the cause for appellants and filed the briefs. With him on the briefs was Cobb & Bosse, LLP.

J. Marie Bischman argued the cause and filed the brief for respondents. With her on the brief were J. Philip Parks and Parks, Bauer, Sime & Winkler, LLP.

Charles Hinkle argued the cause and filed the brief for intervenors. With him on the brief was Stoel Rives, LLP.

Before Edmonds, Presiding Judge, and Brewer and Schuman, Judges.

SCHUMAN, J.

## SCHUMAN, J.

Defendant, an attorney, represented a client in a medical malpractice action against plaintiff.[1] Shortly after the trial, defendant was interviewed by a newspaper reporter and a television newscaster. Defendant's statements were subsequently published in the reporter's newspaper and broadcast on television. Plaintiff then brought this action alleging that defendant's statements were false and defamatory. As part of the discovery process, plaintiff tried to subpoena the newspaper reporter's notes and the reporter himself for a deposition. The reporter's employer, *The Oregonian,* intervened and submitted a motion to quash the subpoena. The court granted the motion, concluding that the reporter and his notes were protected by Oregon's "media shield" law, ORS 44.510 to 44.540. Subsequently, the court granted defendant's motion for summary judgment.[2]

Plaintiff appeals, assigning error to the order quashing his subpoena. He also assigns error to the grant of summary judgment, arguing that the trial court erred in concluding that, for a variety of reasons, the allegedly defamatory statements were not actionable under Oregon defamation law. We agree with plaintiff that the court should not have quashed the subpoena; the reporter and his notes fall within an exception to the media shield law. We also conclude that each of the claims for which the trial court granted summary judgment[3] contains at least one specification for which that grant was erroneous. We therefore reverse and remand on all those claims.

---

[1] There are two named plaintiffs: Brown and Brown's professional corporation. We refer to them collectively as either plaintiff or Brown. The defendants-respondents are Gatti and his law firms. We refer to them as Gatti or defendant. Plaintiff's complaint also named Marie Nolan and 5 Jane Does as defendants, but the claims against them were settled and are not part of this appeal.

[2] The judgment was entered pursuant to ORCP 67 B because plaintiff's claims of intentional interference with prospective business relations and interference with business were abated until defendant concluded his representation of several of plaintiff's other patients.

[3] The first two claims dealt with statements made to *The Oregonian* because the newspaper published the same article in two editions. The third claim regarded statements made on television station KATU.

In a case tried to a jury in Multnomah County Circuit Court, *Nolan v. Brown*, A9711-09412, defendant's client, Marie Nolan, sued Brown for medical malpractice, fraud, and unlawful trade practices, alleging, among other things, that Brown misrepresented his qualifications to perform liposuction and that he performed the procedure on her in a negligent manner. During trial, Brown conceded negligence, and, in exchange for $10,000, Nolan agreed to dismiss the fraud and unlawful trade practices claims. The malpractice claim was then submitted to the jury solely on the issue of damages. The jury awarded the plaintiff approximately $183,000.

After the jury returned its verdict, Gatti spoke with Anderson, a reporter from *The Oregonian*. The next day, the newspaper published an article on the Nolan litigation containing three statements that Brown argues are false and defamatory:

> " '[The Nolan verdict] sends notice to doctors who aren't board-certified to notify the public about their true qualifications,' said attorney Daniel Gatti.

> "Brown portrayed himself as a plastic and reconstructive surgeon in telephone book ads and literature he gave to potential patients.

> "But [Brown] had only the two days of training needed to become certified by the American Academy of Cosmetic Surgeons, which is not recognized by the American Medical Association, Gatti said."

About one week later, television station KATU broadcast a story concerning the Nolan litigation. The story included an interview with Gatti. Four statements from that broadcast are at issue in this case. Two of the statements were made by a KATU reporter:

> "But Brown was no plastic surgeon and he wasn't certified in plastic surgery. He was a dermatologist practicing liposuction and other types of cosmetic plastic surgery.

> "Brown still advertises for cosmetic surgery. He has attended four or five two-day workshops on liposuction * * *."

Two of the statements were made by Gatti:

"You can't put a value on the psychological trauma that these women are going through when they are already embarrassed by even having to be in front of a jury and they've made a mistake and then they've been betrayed.

"USWEST Direct is negligent in not at least requiring doctors to somehow certify that they are indeed certified in the area in which they are wanting to advertise to do some sort of minuscule investigation as to whether or not the doctor is qualified."

Both the Oregonian and KATU subsequently issued retractions of some of the material in the reports.

Plaintiff then brought the present action for defamation. He claimed that statements directly attributable to defendant were false and defamatory and that the newspaper and television reports made false and defamatory statements based on misinformation provided by defendant. As part of the discovery process, both defendant and plaintiff issued subpoenas to Anderson, requesting his deposition and the production of notes, tapes, and any written memoranda of his interview with defendant. The court quashed both subpoenas. Although it gave no reason for quashing defendant's subpoena, it reasoned that plaintiff's was barred by ORS 44.520(1), the media shield law, which (as we discuss more fully below) provides that journalists cannot be compelled to disclose their sources or notes. Defendant subsequently moved for summary judgment on the defamation claims. The court granted the motion, ruling that none of the allegedly defamatory statements was actionable. In doing so, the court did not state a specific reason why each statement was not actionable; rather, it provided a list of potential reasons connected by "and/or," for example, "The motion for summary judgment is granted as to the alleged statement * * * regarding the verdict sending notice because the statement is (1) not false; (2) not defamatory as a matter of law; (3) privileged; and/or (4) a non-defamatory opinion."

■ One reason for granting summary judgment that the trial court listed as applicable to all of the statements in all of the claims was that they were privileged. Because affirming that conclusion would obviate the need for further inquiry, we deal with it first.

 The privilege in question immunizes an attorney for defamatory statements he or she makes "in communications preliminary to a proposed judicial proceeding, or in the institution of, or during the course and as a part of a judicial proceeding in which he participates as counsel, if it has some relation thereto." *Chard v. Galton*, 277 Or 109, 112, 559 P2d 1280 (1977) (quoting *Restatement (Second) of Torts* § 586 (1974)). The absolute privilege "is based upon the ground that 'there are certain relations of life in which it is so important that the persons engaged in them should be able to speak freely that the law takes the risk of their abusing the occasion and speaking maliciously as well as untruly, * * * in order that their duties may be carried on freely and without fear of any action being brought against them * * *.'" *Ramstead v. Morgan*, 219 Or 383, 387, 347 P2d 594 (1959) (internal citations omitted). In other words, "parties, lawyers, judges, jurors, and witnesses must be free to risk impugning the reputations of others, in order to discharge public duties and protect individual rights." *DeLong v. Yu Enterprises, Inc.*, 334 Or 166, 173, 47 P3d 8 (2002). The privilege "secur[es] to attorneys * * * the utmost freedom in their efforts to secure justice for their clients." *Bob Godfrey Pontiac v. Roloff*, 291 Or 318, 335, 630 P2d 840 (1981) (quoting *Restatement* at § 586 comment a); *accord Wollam v. Brandt*, 154 Or App 156, 164, 961 P2d 219 (1998). It protects the attorney from liability "even though the defamatory matter is uttered maliciously, as well as falsely." *Moore v. West Lawn Mem'l Park*, 266 Or 244, 249, 512 P2d 1344 (1973). The privilege, in other words, confers a license to lie; it is strong medicine and therefore appropriate only "in very limited circumstances." *DeLong*, 334 Or at 171.

██ We have identified two components that a statement must have in order to qualify for the privilege: The statement must have "some reference to the subject matter of the pending litigation," and it must be made "in connection with a judicial proceeding." *Wollam*, 154 Or App at 162 n 5; *accord Chard*, 277 Or at 112. Typically, Oregon courts confer the privilege when defamatory statements are made in pleadings, in the courtroom, or in correspondence between opposing parties or their attorneys. *See, e.g., Moore v. Sater*, 215 Or 417, 420, 335 P2d 843 (1959) (privilege applies to statements

made in pleadings); *Chard*, 277 Or at 114 (privilege applied to statements in letter from attorney to insurance company regarding settlement of clients' claims). However, the privilege has been extended to certain unsworn, out-of-court statements when doing so is in the public interest. *See Moore*, 266 Or at 251 (privilege extended to letter written to State Board of Funeral Directors and Embalmers regarding plaintiff's qualifications for funeral director's license); *Ramstead*, 219 Or at 400-01 (privilege extended to unsolicited letter sent by defendant to grievance committee of Oregon State Bar).

Defendant, however, asks us to extend the reach of the privilege further than we have done in the past: to post-trial statements made to members of the press. He argues that, in this case, his statements had sufficient "reference to the subject matter" of the litigation between Nolan and plaintiff to come within the protection of the privilege. *Wollam*, 154 Or App at 162. We agree that defendant's statements referred to the Nolan litigation; the Supreme Court has stated that, " '[i]n determining whether [the subject matter of the statement is] pertinent or relevant * * * courts are liberal and the privilege * * * embraces anything that may possibly be pertinent.' " *Chard*, 277 Or at 113 (quoting *Irwin v. Ashurst*, 158 Or 61, 70, 74 P2d 1127 (1938)). Defendant's statements were "pertinent or relevant"; they pertained to the issues raised by the parties during the course of the Nolan litigation.

However, the Supreme Court's instruction that the requirements for the privilege be interpreted liberally applies to the subject matter of the statement, not to the second component of a statement: its "connection with a judicial proceeding." *Wollam*, 154 Or App at 162 n 5. We conclude that defendant's post-trial statements do not have that necessary connection.

Defendant made his statements to media personnel who played no participatory role in the trial. A few courts have held that statements made to the press can qualify for the privilege. *See, e.g., Dallas Independent School Dist. v. Finlan*, 27 SW3d 220, 239-40 (Tex App 2000); *Prokop v. Cannon*, 7 Neb Ct App 334, 343, 583 NW2d 51 (1998). However, the great weight of authority is to the contrary. Keeton,

for example, declares, "It is clear * * * that statements given to the newspapers concerning the case are not part of a judicial proceeding, and are not absolutely privileged." W. Page Keeton, et al., *Prosser & Keeton on Torts* § 114, 820 (5th ed 1984). In a frequently cited case, the Arizona Supreme Court held that "public policy would be ill served if we immunized the communications made to the reporter by the lawyer defendants. The press conference simply did not enhance the judicial function[.]" *Green Acres Trust v. London,* 141 Ariz 609, 615, 688 P2d 617, 623 (1984); *see also Rothman v. Jackson,* 49 Cal App 4th 1134, 1146, 57 Cal Rptr 2d 284, 292 (1996) (statement at press conference not privileged because it did not "function as a necessary or useful step in the litigation process and * * * serve its purposes"); *see generally* Bruce A. Wessel, *Libel Claims Made Against Lawyers for Statements Made to the Press,* Communications Lawyer 21 (Fall 1998).

Although we are unwilling to say categorically that an attorney's statements to the press can never qualify for absolute immunity, we can say with no hesitation that the statements here do not; they were not only made to the press but were made after trial. With the exception of one case— *Prokop*—we have found no authority whatsoever for the proposition that a post-trial statement to news media can partake of the litigation privilege. Nor can we imagine how immunizing the statements in such a situation would promote the policy objectives that the privilege is designed to achieve. When defendant allegedly made the statements at issue, the jury had rendered a damages verdict in Nolan's favor on the only claim that the parties had not already settled. Furthermore, the public interest in "unhampered operation of the government," *DeLong,* 334 Or at 171, is hardly served by giving attorneys immunity to try their cases to the press, unconstrained by any fear of adverse consequences for lying, after trial litigation has come to an end. Defendant's statements were not made "in connection" with a judicial proceeding. We therefore conclude that the trial court erred in finding that the statements were privileged.

Because the trial court referred to privilege as only one of several alternative grounds for granting defendant's motion for summary judgment with respect to each of the

allegedly defamatory statements, we must now examine those statements to determine whether any of the other grounds specified by the trial court was correct.

■■■■ To establish actionable defamation, plaintiff must prove that defendant made a defamatory statement that was false and that was communicated to a third party. *Reesman v. Highfill*, 327 Or 597, 603-04, 965 P2d 1030 (1998); *Wallulis v. Dymowski*, 323 Or 337, 342-43, 918 P2d 1030 (1996); *Fowler v. Donnelly*, 225 Or 287, 293-95, 358 P2d 485 (1960). A defamatory statement is one that "tends so to harm the reputation of another as to lower him in the estimation of the community," *Beecher v. Montgomery Ward & Co.*, 267 Or 496, 499-500, 517 P2d 667 (1973), including "a statement falsely ascribing to a person characteristics or conduct that would adversely affect his fitness for his occupation or profession," *Bock v. Zittenfield*, 66 Or App 97, 100, 672 P2d 1237, *rev den*, 296 Or 486 (1984). Whether a particular statement is capable of a defamatory meaning is a legal question for the court rather than a fact question for the jury. *Reesman*, 327 Or at 604. The statement can be facially defamatory or "defamatory by implication," that is, a statement from which a reasonable person could draw a defamatory inference. *Id.* In the latter case, the court (and not the jury) examines the connection between the statement and the defamatory inference to determine whether "the inference that the plaintiff seeks to draw from the facially nondefamatory communication [is] reasonable." *Id.* Further, because an opinion can be neither true nor false and because opinion is constitutionally protected free speech, opinion is not actionable defamation. *Id.* at 606. Whether a statement is fact or opinion is a legal question (insofar as the facts *vel non* are undisputed). *Buckner v. Home Depot U.S.A., Inc.*, 188 Or App 307, 311 n 3, 71 P3d 150, *rev den*, 336 Or 92 (2003).

■■■■ We turn first to the statements from the television newscast, each of which is a component of plaintiff's third claim. As noted above, two of these statements were made by a KATU reporter:

> "But Brown was no plastic surgeon and he wasn't certified in plastic surgery. He was a dermatologist practicing liposuction and other types of plastic surgery.

"Brown still advertises for cosmetic surgery. He has attended four or five two-day workshops on liposuction * * *."

Although plaintiff's complaint includes an assertion that defendant provided the newscasters with the information on which they based their statements, defendant denies that assertion in his affidavit. Plaintiff offers nothing beyond his complaint to contradict defendant's denial. Assertions in the complaint do not suffice to raise an issue of material fact for purposes of defeating summary judgment. ORCP 47 D. We therefore conclude that the trial court did not err in granting summary judgment as to the claims involving the two statements made by KATU newscasters and not attributed directly to defendant.

■ Defendant admits making two of the statements broadcast by KATU. In the first, he asserted:

"You can't put a value on the psychological trauma that these women are going through when they are already embarrassed by even having to be in front of a jury and they've made a mistake and then they've been betrayed."

Plaintiff does not argue that this statement is facially defamatory. Rather, he contends that it is defamatory by implication; his complaint alleges that it "[f]alsely impl[ies] Dr. Brown had 'betrayed' Nolan's trust by misrepresenting himself as a plastic surgeon * * *." Thus, because it is undisputed that the statement was published and that alleging that a physician engaged in deceptive and misleading advertising practices would be defamatory, our inquiry focuses on whether the connection between the actual statement and the implication is one that a reasonable person would make and, if so, whether it is both false and nonopinion. In making that inquiry, we view the undisputed facts and the inferences that might be drawn from them in the light most favorable to plaintiff, the party opposing the grant of summary judgment. *Jones v. General Motors Corp.*, 325 Or 404, 407, 939 P2d 608 (1997).

The statement at issue is that women, including Nolan, were "betrayed" by plaintiff. The implied defamatory statement is that plaintiff intentionally engaged in deceptive and misleading advertising. In determining whether the

statement is capable of a defamatory implication, we take into consideration the context in which it occurred. *Reesman*, 327 Or at 604. Defendant made the statement on a local news show as part of a story about a trial in which he had obtained a $183,000 verdict on behalf of his client against plaintiff for medical malpractice. The transcript of the interview contains the following exchanges:

"CM [Cathy Marshall, KATU reporter]: Millions turn to these pages for help and guidance, but a Washington woman says an ad cost her her health[,] and she is heading to court. Good evening and thank you for joining us. I'm Cathy Marshall.

"JM [John Marler, KATU reporter]: And I am John Marler. It was a botched plastic surgery. There is no dispute now about that. Still to be resolved, though[:] [D]oes part of the blame lie with the yellow pages? Sheila Hamilton brings us an exclusive report on a first[-]of[-]its[-]kind lawsuit against USWESTDEX.

"SH [Sheila Hamilton, KATU reporter]: When Marie Nolan recovered from a three year illness, she thought plastic surgery on her neck and arms might help renew her self-image. She turned to the yellow pages to find a plastic surgeon who specialized in liposuction. Under the heading 'plastic and reconstructive surgery,' she found the name 'Dr. Timothy Brown.'

"MN [Marie Nolan]: No matter what the procedure is that you are looking for[,] whether it is[,] you know[,] a child with cancer and you are looking for an oncologist or whether it's[,] you know, a serious procedure or not, you know you are trusting that information is true, and that's not necessarily true.

"SH: But Brown was no plastic surgeon and he wasn't certified in plastic surgery. He was a dermatologist practicing liposuction and other types of cosmetic surgery.

"MN: I basically put my life in his hands, and [in] hindsight if I had done that to my child, um you know, I'd be responsible.

"SH: And in the hands of Dr. Brown, Marie suffered irreparable harm. Here is a picture of her arms before. Here, after. And look at the damage the liposuction did to her neck.

"MN: There was areas where my skin was adhering to the bone. There was gouges and grooves. It was very apparent that it was[,] um I felt[,] a negligent procedure.

"SH: Attorney Dan Gatti knew of Dr. Brown's work. He has now sued him six times for medical negligence in liposuction procedures.

"DG [Daniel Gatti]: You can't put a value on the psychological trauma that these women are going through when they are already embarrassed by even having to be in front of a jury and they've made a mistake and then they've been betrayed.

"SH: Gatti won Marie's case against Dr. Brown and is now going after the pages where Brown advertised.

"DG: US West Direct is negligent in not at least requiring doctors to somehow certify that they are indeed certified in the area in which they are wanting to advertise to do some sort of minuscule investigation as to whether or not the doctor is qualified."

Clearly, in this context, a reasonable viewer would interpret defendant's statement that plaintiff "betrayed" patients as an assertion that plaintiff had done so by intentionally placing a deceptive and misleading advertisement in the yellow pages. The connection between defendant's actual statement (plaintiff's patients had "been betrayed") and a defamatory inference (plaintiff intentionally placed a deceptive and misleading ad in the yellow pages) is not, in context, tenuous or unreasonable. Defendant, in other words, did make a defamatory statement by implication. That statement was: Plaintiff intentionally placed a deceptive and misleading advertisement in the yellow pages.

 That conclusion does not end the inquiry, however, because in order to be actionable, the defamatory statement must be neither true nor opinion. *Id.* at 603-04. We have no difficulty in concluding that what plaintiff intended or did not intend is a question of fact, not opinion, and must be submitted to a factfinder. Further, defendant's statement has elements about the truth of which reasonable jurors could disagree: plaintiff's intentions, as well as whether the undisputed facts—plaintiff advertised in the yellow pages under the heading "plastic and reconstructive surgeons," his ad stated

he was "board certified," he was board certified in dermatology, clinical pathology, and anatomical pathology but not in plastic or reconstructive surgery—amount to deception. The trial court therefore erred in granting defendant's motion for summary judgment with respect to the statement about patient betrayal.

We reach the same conclusion regarding the other statement plaintiff made on KATU:

"US West Direct is negligent in not at least requiring doctors to somehow certify that they are indeed certified in the area in which they are wanting to advertise to do some sort of minuscule investigation as to whether or not the doctor is qualified."

Again, plaintiff alleges only that the statement is defamatory by implication; his complaint alleges that defendant "[f]alsely impl[ied] Dr. Brown misrepresented himself as a plastic surgeon in his advertisement in the US West Direct Yellow Pages * * *."

The statement implies, at most, that plaintiff misrepresented his qualifications by placing an ad in the section of the yellow pages designated for plastic and reconstructive surgeons when in fact he was not certified in those specialties. As we concluded with respect to the statement regarding betrayal, the implied statement contains elements about the truth of which reasonable jurors could disagree: whether plaintiff directed US West to place the ad in the plastic and reconstructive surgeons section and whether, if he did, that act amounted to an assertion that he was board certified in those areas. Thus, the trial court did err in granting summary judgment with respect to that statement. Because plaintiff's third claim contains allegations that raise genuine issues of material fact, the trial court erred in granting summary judgment as to that claim.

We turn to the statements that appeared in *The Oregonian* and that constitute plaintiff's first and second claims. The first statement was:

"But [Brown] had only the two days of training needed to become certified by the American Academy of Cosmetic

Surgeons, which is not recognized by the American Medical Association, Gatti said."

In addition to concluding that the statement was privileged—a conclusion we have rejected—the trial court also concluded that "the only 'evidence' submitted to contradict Mr. Gatti's sworn denial that he made these statements is inadmissible hearsay." We agree with the trial court that the statement is inadmissible hearsay. *Hickey v. Settlemier*, 318 Or 196, 206, 864 P2d 372 (1993) ("a newspaper article is hearsay, and not admissible to prove publication by a defendant"). However, we conclude that the court erred nonetheless in granting summary judgment, but it did so because of an earlier error: quashing plaintiff's subpoena of Anderson. Had that subpoena been permitted, the article might not have been the "only 'evidence' " that defendant made the statement; the subpoena might have produced direct, nonhearsay evidence that he did. Further, a question of material fact exists as to whether the statement is true. Thus, because, as we explain below, the court erred in quashing the subpoena, we must reverse and remand. If, on remand, the evidence supports a finding that defendant did make the statement, a jury must decide both that issue and, if it finds that he did, whether the statement is true or false.

In its order quashing plaintiff's subpoena, the trial court relied on both the Multnomah Circuit Court's Supplementary Local Rule (SLR) 5.045(1) and the media shield law, ORS 44.510 to 44.530. We address each of these bases in turn.

SLR 5.045(1) provides, with exceptions not applicable here:

"No Motion for Reconsideration on any pre-trial, trial, or post-trial civil or criminal matter shall be heard, reviewed, or considered by any judge sitting in the Fourth Judicial District; nor shall any such judge review a ruling rendered by any other judge * * *."

In the present case, defendant was the first party attempting to subpoena the *Oregonian* reporter; plaintiff moved to quash and the court granted the motion. When plaintiff subsequently attempted to subpoena the same material, the trial court apparently treated that act as an attempt to persuade

the court to reconsider quashing defendant's earlier sub-poena. The problem with this argument is that plaintiff's action was not a request to the trial court to reconsider its ruling quashing *defendant's* subpoena, but was his own inde-pendent attempt to issue a subpoena. The court had yet to consider that request, so there was nothing to *reconsider*. We conclude that SLR 5.045 was not a proper basis upon which to quash plaintiff's subpoena.

■ Oregon's media shield law grants the following privilege:

> "(1) No person connected with, employed by or engaged in any medium of communication to the public shall be required by a legislative, executive or judicial offi-cer or body, or any other authority having power to compel testimony or the production of evidence, to disclose, by sub-poena or otherwise:

> "(a) The source of any published or unpublished infor-mation obtained by the person in the course of gathering, receiving or processing information for any medium of com-munication to the public; or

> "(b) Any unpublished information obtained or pre-pared by the person in the course of gathering, receiving or processing information for any medium of communication to the public."

ORS 44.520. However, ORS 44.530(3) creates an exception to this general rule:

> "The provisions of ORS 44.520(1) do not apply with respect to the content or source of allegedly defamatory information, in civil action for defamation wherein the defendant asserts a defense based on the content or source of such information."

Plaintiff argued to the trial court that the exception applied to his subpoena, thereby allowing him to circumvent the shield. Defendant argued that the exception did not apply, thereby maintaining the shield. The trial court agreed with defendant. The parties renew their arguments on appeal.

The dispute focuses on two issues: Whether defen-dant asserted "a defense based on the *content or source* of" the published information and whether the "defendant" in the

phrase "wherein the *defendant* asserts a defense" includes both media and nonmedia defendants.[4] ORS 44.530(3) (emphasis added). The italicized terms are not defined by the statute; determining their meaning therefore presents a question of statutory interpretation.

The question whether defendant has asserted a defense in this defamation action based on the *content or source* of the reporter's information requires little discussion. The gist of defendant's position is that, first, he did not say certain of the statements attributed to him and, second, that the article misrepresented what he did say. The former argument relates to the source of the information: defendant asserts that the source is not he. The latter argument relates to the content of the information: defendant asserts that the content of what he did say is not the same as the statement attributed to him by the reporter. We therefore reject defendant's contention that the exception does not apply to him because he did not raise a defense based on the content or

---

[4] *The Oregonian* (in its role as intervenor) submitted with its appellate brief the affidavit of its reporter, Anderson, asserting that defendant did not make the statements Anderson had attributed to him in the article. According to *The Oregonian*, that affidavit renders most of the media shield issues nonjusticiable, and we should consider the affidavit according to the rule the Supreme Court announced in *First Commerce of America v. Nimbus Center Assocs.*, 329 Or 199, 206, 986 P2d 556 (1999), giving appellate courts the inherent authority to consider evidence that a case has become moot after trial.

We decline to address the merits of intervenor's argument because we decline to accept the Anderson affidavit. *First Commerce of America* involved a situation in which the plaintiff's claims against the defendant depended on the resolution of plaintiff's claim against a third party. When the third party and the plaintiff settled, the plaintiff's claims against the defendant became moot. The record before the appellate court, however, did not contain the necessary proof of mootness, that is, the settlement agreement between the plaintiff and the third party. The Supreme Court granted the plaintiff's request to supplement the record with a document proving the terms of the settlement between the plaintiff and third party. The circuit court held that, "[i]f a case is not justiciable because an event that is not reflected in the record has rendered the case moot, an appellate court has the inherent power to consider evidence of that event." *Id.* at 206. The situation in the present case bears no resemblance to the one in *First Commerce of America*. Intervenor does not seek to introduce evidence that an event not reflected in the record (such as a settlement) occurred. It seeks rather to introduce substantive evidence that an event clearly reflected in the record (Anderson's conversation with defendant) occurred in one way as opposed to another, a disputed issue of fact that lies at the center of the case. Even if we had "inherent power" to accept the affidavit, we would not exercise that power here.

source of Anderson's information. His defense was, in fact, based on content and source.

■ Defendant's second argument—that the exception exposes media personnel to subpoena only in cases where the medium is itself the defendant—fails as well. Most obviously, that argument fails because the unambiguous language of the statute says something quite different. The statute announces that the shield does not apply in defamation cases "wherein *the defendant* asserts a defense based on the content or source of such information." ORS 44.530(3) (emphasis added). It does *not* say that the shield is lifted in cases "wherein [*a media*] defendant asserts a defense based on the content or source of such information." To construe the statute as though it meant what defendant wants it to mean would be to violate the command "not to insert what has been omitted," ORS 174.010, and the rule "that words of common usage typically should be given their plain, natural, and ordinary meaning." *PGE v. Bureau of Labor and Industries*, 317 Or 606, 611, 859 P2d 1143 (1993).

Nor does the context in which the term "defendant" occurs provide any justification for reading the term as though it said "media defendant." Intervenor points out that the term occurs in what is commonly called the "media shield law," the purpose of which, we should therefore infer, is to shield the media. That assertion begs the issue, which is not whether the purpose of the law is to protect media but when its protection should be lifted. The fact that the general thrust of the law is to establish protection might have some marginal bearing on whether or not to construe an ambiguous exception expansively or on how to fill some statutory interstice, but it can have no bearing on whether a clearly stated exception should be expanded beyond its text.

That same principle undermines the force of arguments based on the statute's legislative history—presuming, without deciding, that we are free to consider that history by virtue of ORS 174.020(3) ("A court shall give the weight to the legislative history that the court considers to be appropriate."), despite the Supreme Court's clear command to the contrary in *PGE*, 317 Or at 611-12 (permitting consideration of

legislative history "[i]f, but only if, the intent of the legislature is not clear from the text and context inquiry"). The media shield law, known during the legislative process as Senate Bill 206, was enacted in 1973 as an act "[r]elating to assurance of free dissemination of information by media of communication." Or Laws 1973, ch 22. Section 5 of SB 206 contained the exception now found in ORS 44.530(3), and the exception has remained substantively unchanged since its enactment.[5] The legislative history of SB 206 consists of the minutes of the Joint Special Committee on Professional Responsibility and the exhibits presented to that committee. Those minutes and exhibits indicate that most of the discussion at the committee hearings and work sessions concerned whether the media person's testimonial privilege should be qualified or unqualified. When the committee addressed section 5, it never directly addressed the question that is now before this court.

Thus, the legislative history implies at most only what the statute itself declares: its purpose is to provide a shield that media personnel can use to avoid having to disclose sources and unpublished notes. That conclusion does not compel (or even support) the inference that, when the legislature created the exception for "allegedly defamatory information in defamation cases wherein the defendant asserts" certain defenses, it intended to reserve the exception to situations in which media or media employees were defendants.

Finally, defendant and intervenor make two arguments based on general maxims of statutory construction: first, that plaintiff's "plain meaning" interpretation of ORS 44.530(3) creates absurd results because "it makes no sense to [withdraw the shield from a medium of communication] when the dispute is between two parties who have no connection whatever to the news gathering profession"; and, second, that the interpretation raises serious constitutional issues because it creates a special privilege for nonmedia defamation defendants that other defendants in other tort actions do

---

[5] Changes to the introductory language in ORS 44.530(3) were made in 1979, Or Laws 1979, ch 820, § 2, but those changes were not substantive.

not enjoy. We find neither of these arguments to be persuasive, but, in any event, we are enjoined from using general maxims of construction except when text, context, and legislative history leave unresolved ambiguity. *PGE*, 311 Or at 612; *State v. Vasquez-Rubio*, 323 Or 275, 282-83, 917 P2d 494 (1996). That is not the case here. Because the language of ORS 44.530(3) is unambiguous and neither its context nor its legislative history detracts from its clarity, we conclude that it creates an exception to the media shield law that exposes a media witness to a subpoena "in [a] civil action for defamation wherein the defendant asserts a defense based on the content or source of" allegedly defamatory information even if the case does not involve a media defendant. The trial court should not have quashed plaintiff's subpoena.

That conclusion, as we explained above, requires us to reverse and remand the trial court's grant of summary judgment regarding defendant's alleged statement that plaintiff "had only the two days of training needed to become certified by the American Academy of Cosmetic Surgeons." If on remand Anderson's testimony or notes raise a triable inference that defendant did make the statement, then the trial court must allow a jury to determine whether he made it and also whether the statement is false—a determination that the parties recognize, and we agree, depends on disputed issues of fact.

■ Plaintiff's last two allegations regard defendant's alleged statements implying that plaintiff is among the doctors who "portray themselves as plastic surgeons when they're not" and that the verdict against him "sends notice to doctors who aren't board-certified to notify the public about their true qualifications." The two statements appear in such close proximity that each is context for the other and their import cannot be separated. The statements appear as the three lead paragraphs in *The Oregonian's* article:

"A Multnomah County jury awarded more than $180,000 on Friday to a woman who was scarred by a botched liposuction procedure.

"The award disappointed the woman's lawyer, who was seeking more than $2 million, but he said it still should

send a message to doctors who portray themselves as plastic surgeons when they're not.

"'It sends notice to doctors who aren't board-certified to notify the public about their true qualifications,' said attorney Daniel Gatti."

By stating first that the verdict "send[s] a message to doctors who portray themselves as plastic surgeons when they're not" and then referring immediately thereafter to "doctors who aren't board-certified," the statements make a single implication about plaintiff: he is not a board certified plastic surgeon, but he "portray[ed]" himself as one. Reasonable jurors could draw different inferences about whether or not plaintiff's listing in the yellow pages amounts to an attempt to portray himself as a plastic surgeon, and further, the record does not contain any facts regarding the content of plaintiff's other advertisements or literature. Nor can the implication be considered an opinion. Thus, if the Anderson testimony indicates that defendant gave *The Oregonian* information on which it based the statements, a jury question could arise as to whether the statement is actionable defamation. We must therefore conclude that the trial court erred with respect to two specifications of defamation contained in the claims regarding statements made to *The Oregonian*. That being the case, we must reverse the grant of summary judgment as to those two claims.

Judgment on plaintiffs' first, second, and third claims reversed and remanded; order quashing subpoena reversed; otherwise affirmed.