Argued and submitted May 11, 2005, decision of Court of Appeals affirmed in part and reversed in part; judgment of circuit court affirmed in part and reversed in part, and case remanded to circuit court for further proceedings October 12; respondents' petition for reconsideration allowed in part and opinion amended accordingly November 27, 2006

Timothy M. BROWN, M.D.,
and Timothy M. Brown, M.D., P.C.,
an Oregon professional corporation,
*Respondents on Review,*

*v.*

Daniel J. GATTI;
Gatti, Gatti, Maier, Krueger & Associates,
an Oregon partnership;
Gatti, Gatti, Maier, Krueger, Sayer & Associates,
an Oregon partnership;
Gatti & Gatti, P.C.,
an Oregon professional corporation,
*Petitioners on Review,*

*and*

Marie NOLAN
and Jane Does 1-5,
*Defendants,*

*and*

OREGONIAN PUBLISHING COMPANY
and David R. Anderson,
*Intervenors.*

(CC 0002-01586; CA A115927; SC S51981)

145 P3d 130

J. Philip Parks, Salem, argued the cause and filed the brief for petitioners on review. With him on the brief was Parks, Bauer, Sime, Winkler & Fernety.

Montgomery W. Cobb, Portland, argued the cause and filed the brief for respondents on review. With him on the brief was Cobb & Bossé, LLP.

Before Carson, Chief Justice,** and Gillette, Durham, Riggs,*** De Muniz,**** and Balmer, Justices.*****

GILLETTE, J.

---

** Chief Justice when case was argued.

*** Riggs, J., retired effective September 30, 2006, and did not participate in the decision of this case.

**** Chief Justice when case was decided.

***** Kistler and Walters, JJ., did not participate in the consideration or decision of this case.

## GILLETTE, J.

Plaintiffs, Timothy M. Brown, M.D. (Brown), and Timothy M. Brown, M.D., P.C. (collectively, Brown plaintiffs), filed a defamation action against the following defendants: (1) Daniel J. Gatti (Gatti), who is a lawyer; (2) Gatti, Gatti, Maier, Krueger & Associates; Gatti, Gatti, Maier, Krueger, Sayer & Associates; and Gatti & Gatti, P.C. (we refer to Gatti and his firms collectively as Gatti defendants);[1] and (3) Marie Nolan.[2] The trial court granted summary judgment for Gatti defendants. On appeal, the Court of Appeals reversed. *Brown v. Gatti*, 195 Or App 695, 99 P3d 299 (2004). We allowed Gatti defendants' petition for review and now hold that none of the allegedly defamatory statements attributed to them, when read in context, is defamatory. We therefore reverse the decision of the Court of Appeals and affirm the trial court's grant of summary judgment to Gatti defendants.

The parties do not contest the following facts. Nolan sued Brown for medical malpractice respecting the manner in which Brown had performed a liposuction operation on her. Nolan asserted claims for negligence, fraud, and unlawful trade practices, specifically alleging (among other things) that Brown had misled Nolan about his qualifications to perform such surgery. Gatti represented Nolan in that malpractice case.

At trial, Nolan agreed to dismiss her claims for fraud and unlawful trade practices, in exchange for which Brown paid her $10,000 and conceded negligence. On the only remaining issue, damages, a jury awarded Nolan $183,625.

After that trial, Gatti spoke with a reporter from *The Oregonian*. *The Oregonian* then published an article related to the Nolan litigation, headlined "Botched Liposuction Yields $180,000-plus in Damages." Afterward, Gatti appeared in a news story broadcast on KATU, a Portland

---

[1] The allegedly defamatory statements were made by defendant Gatti. It therefore is necessary to distinguish him as an actor from the various iterations of his law firm, which are codefendants.

[2] Plaintiffs' claim against Nolan, who was a client of the Gatti defendants, was settled. It is not involved in this appeal.

television station. The KATU broadcast dealt with what its reporter described as "a first of its kind lawsuit against USWestDex" based on an alleged connection between Brown's advertisements in the US West Direct "Yellow Pages" and Nolan's injuries.[3]

Brown plaintiffs then brought the present action for defamation, among other things. (Brown plaintiffs did not name either *The Oregonian* or KATU as defendants.) In their complaint, Brown plaintiffs alleged that *The Oregonian* article contained three statements that were defamatory. Only one of those statements purported to quote Gatti directly:

> " 'It [the Nolan verdict] sends notice to doctors who aren't board-certified to notify the public about their true qualifications,' said attorney Daniel Gatti."

Brown plaintiffs' complaint alleged that that statement was defamatory by implication, because it implied "that Dr. Brown is not a board certified physician." Although he is not board certified in plastic surgery, Brown is board certified in dermatology, clinical pathology, and anatomic pathology.

Brown plaintiffs separately alleged in their complaint that four statements in the KATU broadcast were defamatory by implication. Only two of those statements involved Gatti speaking on camera. (The other two statements were made by the KATU reporter.) In the two statements that he made on camera, Gatti said:

> "You can't put a value on the psychological trauma that these women are going through when they are already embarrassed by even having to be in front of a jury and they've made a mistake and then they've been betrayed.
>
> "* * * * *

---

[3] The parties and the documents on file are not consistent in the name that they use to refer to the publisher of the telephone Yellow Pages at issue. For example, the KATU broadcast transcript uses both "Uswestdex" and "USWEST Direct," the *Oregonian* article uses "US West Dex," the complaint uses "US West Direct," and the petition for review uses "USWEST Direct." There is no basis in the record that we have been able to identify that enables us to determine which of those titles (if any) accurately reflects the publisher's name. We have used "USWEST Direct" in the text above, but we cannot warrant its accuracy, and we have not attempted to conform quotations to that usage.

> "USWEST Direct is negligent in not at least requiring doctors to somehow certify that they are indeed certified in the area in which they are wanting to advertise [or] to do some sort of minuscule investigation as to whether or not the doctor is qualified."

Brown plaintiffs' complaint alleged that both statements were defamatory by implication. Brown plaintiffs contended that the first statement implied that "Dr. Brown had 'betrayed' Nolan's trust by misrepresenting himself as [a] plastic surgeon," while the second statement implied that "Dr. Brown misrepresented himself as a plastic surgeon in his advertisement in the US West Direct Yellow Pages."

After certain pretrial proceedings that are not relevant to this case as it comes to us, Gatti defendants moved for summary judgment against Brown plaintiffs. In their motion, Gatti defendants contended (among other things) that Gatti never made some of the statements attributed to him, that some of Gatti's statements were not defamatory, and that some of Gatti's statements were constitutionally protected expressions of opinion. As noted, the trial court granted Gatti defendants' motion for summary judgment on the defamation claim, and it entered a judgment in their favor on the defamation claim pursuant to ORCP 67 B.

On Brown plaintiffs' appeal, the Court of Appeals affirmed in part and reversed in part. First, the court agreed with the trial court that summary judgment was appropriate against Brown plaintiffs as to two statements in the KATU broadcast that had been made by the KATU reporter, rather than Gatti. 195 Or App at 705. The Court of Appeals further concluded that the trial court had erred in granting summary judgment as to two statements in *The Oregonian* that Brown plaintiffs claimed were defamatory, but that did not directly quote Gatti. *Id.* at 708-14. Neither side challenges those rulings on review.

This case thus boils down to the question whether the remaining three statements—all involving direct quotes of Gatti—could be found by a jury to be defamatory. The Court of Appeals agreed with Brown plaintiffs that the statements could be defamatory and therefore reversed summary judgment for Gatti defendants. As to all three statements,

the Court of Appeals concluded that the statements could be defamatory by implication and that they were not constitutionally protected opinion. *Id.* at 705-08 (KATU statements); *id.* at 714-15 (*The Oregonian* statement). We allowed Gatti defendants' petition for review to address that question.

■■    This is a defamation case. A defamatory communication is one that " 'tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.' " *King v. Menolascino*, 276 Or 501, 503, 555 P2d 442 (1976) (quoting *Restatement (First) of Torts* § 559). A defamatory communication "would subject another to ' * * * hatred, contempt or ridicule * * * [or] tend to diminish the esteem, respect, goodwill or confidence in which [the other] is held or to excite adverse, derogatory or unpleasant feelings or opinions against [the other].' " *Reesman v. Highfill*, 327 Or 597, 603, 965 P2d 1030 (1998) (alterations in original; quoting *King*, 276 Or at 504; further quotation marks and internal citations omitted).

■■    In the professional context, a statement is defamatory if it is false and " 'ascribes to another conduct, characteristics or a condition incompatible with the proper conduct of his lawful business, trade, [or] profession.' " *Fowler v. Stradley*, 238 Or 606, 611, 395 P2d 867 (1964) (quoting *Restatement (First) of Torts* § 573). Indeed, if a defendant has defamed a plaintiff by falsely "accus[ing] him of misconduct or dishonesty in the performance of his profession or employment," then the matter "is actionable without proof of specific harm." *Wheeler v. Green*, 286 Or 99, 124, 593 P2d 777 (1979).

■    Here, Brown plaintiffs allege that Gatti's three statements, while admittedly not directly defamatory, are defamatory "by implication."

> "Defamation by implication is the label commonly given to a claim that requires drawing a defamatory inference from a facially nondefamatory communication. When defamation by implication is alleged, this court has held that the link between the communication and the defamatory inference must not be 'too tenuous.' In other words, when a claim for defamation requires the drawing of a defamatory inference, the inference that the plaintiff seeks to draw

from the facially nondefamatory communication must be reasonable."

*Reesman*, 327 Or at 604 (citations omitted).

In defamation cases, the court and the jury perform a shared task.

"The court determines whether a communication *is capable* of a defamatory meaning. If the court determines that it is, the matter is then submitted to the jury for a determination of whether a defamatory meaning *was understood* by the recipients."

*Beecher v. Montgomery Ward & Co.*, 267 Or 496, 500, 517 P2d 667 (1973) (emphases in original; citations omitted); *see also Restatement (Second) of Torts* § 614 (1977) (court determines whether communication is capable of bearing particular meaning and whether that meaning is defamatory; jury determines whether recipients of communication actually understood it in defamatory way).

The meaning of an allegedly defamatory statement or publication focuses on how a recipient would understand it. The meaning is determined by

"look[ing] to the general purport and intent of the article published and not to isolated sentences. Words are to be construed in their ordinary acceptance and meaning. The test is: What sense will be given to them by a reader of ordinary intelligence? Will the natural and proximate consequence be to injure the person about whom they have been published? Will such words tend to bring a person into public hatred, contempt or ridicule?"

*Peck v. Coos Bay Times Pub. Co. et al.*, 122 Or 408, 418, 259 P 307 (1927). In performing its gatekeeping function, a court considers not just the correct meaning of the publication, but also any mistaken meanings that are reasonable. *Fowler*, 238 Or at 617 ("the meaning of a publication is that which the reader correctly or mistakenly, but reasonably, understands it to have"); *Restatement (Second) of Torts* § 563 (1977) (same).

In determining whether a statement is capable of a defamatory meaning, moreover, courts must be careful not to tread on the jury's role as the finder of fact:

" 'In many cases imputations are so clearly innocent that the court is justified in determining the question without submission to the jury. On the other hand, if in the opinion of the court, the question is one as to which reasonable men might differ, it is for the jury to determine which of the two permissible views they will take.' "

*Hinkle v. Alexander*, 244 Or 267, 279, 417 P2d 586 (1966) (quoting *Restatement (First) of Torts* § 614 comment c).

Here, we must decide whether the trial court correctly granted summary judgment for Gatti defendants. Under ORCP 47, we examine the pleadings, depositions, affidavits, and admissions on file, and construe all facts in the light most favorable to Brown plaintiffs, the parties opposing summary judgment. *See* ORCP 47 C (2000) (so stating).[4] If "no objectively reasonable juror could return a verdict for" Brown plaintiffs, and if Gatti defendants were "entitled to a judgment as a matter of law," then summary judgment was appropriate. *Id.*

As noted, Gatti defendants challenge only the Court of Appeals' ruling on three statements. As to those statements, Gatti defendants contend two things: either (1) any defamatory inference to be drawn from the statement is too tenuous; or (2) the statement, even if defamatory, was a statement of opinion and therefore not actionable. We consider the three statements in order.

■ As noted, Brown plaintiffs alleged that Brown was defamed by implication by the following sentence in *The Oregonian* article:

" 'It [the Nolan verdict] sends notice to doctors who aren't board-certified to notify the public about their true qualifications,' said attorney Daniel Gatti."

Brown plaintiffs assert that Gatti's statements imply an assertion about Brown, *viz.*, "that Dr. Brown is not a board certified physician." To evaluate that assertion, we consider Gatti's quote in its context, *i.e.*, the "general purport and intent of the article." *Peck*, 122 Or at 418.[5] The article

---

[4] ORCP 47 has since been amended. Those amendments do not apply to this case.

[5] We reprint the article in full in an Appendix. For purposes of argument, we presume here that the article accurately reflects the context of Gatti's statements to the reporter, and so it serves as appropriate context.

describes a malpractice verdict against Brown. Thus, if that verdict "sends notice to doctors who aren't board-certified," it must be because other doctors share a characteristic with Brown that makes them vulnerable to such legal actions as the one brought against Brown. As to that, the only such characteristic is not being board certified.[6]

Having identified the implied assertion, however, we disagree that the assertion was or could be defamatory. We first note just how narrow the defamatory inference that Brown plaintiffs claim can be drawn from that sentence actually is. Brown plaintiffs specifically argue that Gatti's quote contains the defamatory inference that Brown is not board certified in *any* area of medicine. That narrow inference is not accidental. Brown is not board certified in plastic or reconstructive surgery, although he is board certified in dermatology, clinical pathology, and anatomic pathology. If Gatti's quote implied only that Brown was not board certified in plastic or reconstructive surgery, then the implication would be true. To be capable of a defamatory meaning, then, Gatti's quote must be capable of being understood to imply that Brown is not board certified in any area of medicine at all.

It is true that Gatti's quote, taken by itself, refers broadly to "doctors who aren't board certified," without in any direct way limiting the scope of the words "board certified." Again, however, we do not consider "isolated sentences" but the "general purport and intent of the article." *Peck*, 122 Or at 418. And, in context, the article only discusses Brown's credentials to perform plastic surgery, not his general qualification to practice any other types of medicine. In particular, the immediately preceding sentence appears to us to establish that Gatti meant only that Brown was not board certified as a plastic surgeon:

> "The award disappointed the woman's lawyer, who was seeking more than $2 million, but he said it still should

---

[6] One may doubt the substantive truth of Gatti's statement. Because of the partial settlement between Brown and Nolan, Brown admitted negligence, and the jury only considered damages. Brown did not admit, and the jury did not decide, that Brown had made any misrepresentations. Thus, the verdict was about negligence, not about whether doctors should " 'notify the public about their true qualifications.' " But, as we will discuss, Brown alleged that that statement defamed him only by implying that Brown was not board certified in any area of medicine.

> send a message to *doctors who portray themselves as plastic surgeons when they're not*.
>
> " 'It sends notice to doctors who aren't board-certified to notify the public about their true qualifications,' said attorney Daniel Gatti."

(Emphasis added.) In summary, we hold that no reasonable juror could read Gatti's statement, when read in context, to refer to anything beyond the fact that Brown is not board certified as a plastic surgeon.

■ The second statement at issue here comes from the KATU broadcast. As noted, Gatti stated in that broadcast:

> "You can't put a value on the psychological trauma that these women are going through when they are already embarrassed by even having to be in front of a jury and they've made a mistake and then they've been betrayed."

Brown plaintiffs alleged that that statement falsely implies that Brown "had 'betrayed' Nolan's trust by misrepresenting himself as a plastic surgeon."

Gatti defendants argue that the statement refers to Nolan being betrayed by USWEST Direct, not by Brown. We disagree. Again, we consider the statement in context.[7]

The KATU broadcast began by noting Nolan's claim that the Yellow Pages had some legal responsibility for Nolan's injuries. The broadcast then outlined the circumstances leading to Nolan's injury. That part of the broadcast focused on Brown's culpability, and it ended with Gatti making the disputed statement:

> "[Reporter]: When Marie Nolan recovered from a three[-]year illness[,] she thought plastic surgery on her neck and arms might help renew her self-image. She turned to the yellow pages to find a plastic surgeon who specialized in liposuction. Under the heading 'plastic and reconstructive surgery,' she found the name 'Dr. Timothy Brown.'

---

[7] We reprint the transcript of the full broadcast in an Appendix. We again presume that the broadcast accurately reflects the context of Gatti's statements to the reporter.

"[Nolan]: No matter what the procedure is that you are looking for * * *, you know you are trusting that information is true and that's not necessarily true.

"[Reporter]: But Brown was no plastic surgeon and he wasn't certified in plastic surgery. He was a dermatologist practicing liposuction and other types of cosmetic surgery.

"[Nolan]: I basically put my life in his hands and [in] hindsight if I had done that to my child, um you know, I'd be responsible.

"[Reporter]: And in the hands of Dr. Brown Marie suffered irreparable harm. Here is a picture of her arms before. Here, after. And look at the damage the liposuction did to her neck.

"[Nolan]: * * * It was very apparent that it was um I felt a negligent procedure.

"[Reporter]: Attorney Dan Gatti knew of Dr. Brown's work. He has now sued him six times for medical negligence in liposuction procedures.

"[Gatti]: You can't put a value on the psychological trauma that these women are going through when they are already embarrassed by even having to be in front of a jury and they've made a mistake and then they've been betrayed."

Only then does the broadcast return to USWEST Direct's alleged role and explain why it, too, allegedly was liable for the harm:

"[Reporter]: Gatti won Marie's case against Dr. Brown and is now going after the pages where Brown advertised.

"[Gatti]: USWEST Direct is negligent in not at least requiring doctors to somehow certify that they are indeed certified in the area in which they are wanting to advertise [or] to do some sort of minuscule investigation as to whether or not the doctor is qualified."

In context, we cannot agree with Gatti defendants' claim that a reasonable viewer would conclude that "these women" had been "betrayed" by USWEST Direct, not by Brown. Although the broadcast had asserted earlier that USWEST Direct allegedly had some culpability for Nolan's

injury, that reference was so distant that "betrayed" cannot reasonably be understood to refer to it.

That said, however, we cannot see how a reasonable juror could find Gatti's specific statement to be defamatory, even when it is read in context. Gatti's characterization of Brown's actions as a "betrayal" of Nolan arose from Brown's failure to perform competently the liposuction that he had been trusted to do. (If the result had been satisfatory, then Brown's lack of certification would have been irrelevant.) Thus, when read in context, the statement referred to the reasons why Nolan and others had sued Brown, *viz.*, his professional negligence. The contrary series of inferences that Brown plaintiffs wish to have a jury draw are not supportable. The trial court thus correctly granted summary judgment to Gatti defendants as to the "betrayal" statement, and the Court of Appeals erred in overturning that ruling.

■   In his second statement from the KATU broadcast at issue here, Gatti said:

> "USWEST Direct is negligent in not at least requiring doctors to somehow certify that they are indeed certified in the area in which they are wanting to advertise [or] to do some sort of minuscule investigation as to whether or not the doctor is qualified."

Given that the broadcast had identified the USWEST Direct Yellow Pages as "the pages where Brown advertised," Brown plaintiffs argue that that statement falsely implies that Brown "misrepresented himself as a plastic surgeon in his advertisement in the US West Direct Yellow Pages."

As with the other KATU broadcast statement, Gatti defendants argue that the statement "is nothing more than an indictment of USWEST Direct." We agree that a viewer would understand the statement to indict USWEST Direct, but it does more than that. It specifically charges that USWEST Direct failed to investigate whether doctors are "qualified" "in the area in which they [doctors] are wanting to advertise." Gatti's statement came after the broadcast had discussed in some detail how Brown had injured Nolan, and in particular how Brown had allegedly misrepresented his

qualifications in the Yellow Pages. A reasonable viewer certainly would consider that discussion to be a specific example of the larger problem complained about by Gatti. In other words, Gatti's complaint that USWEST Direct should require some proof of credentials when it sells advertising, considered in context, plainly implied that Brown had misrepresented his credentials in his advertising.

That does not end the matter, however. On this record, it appears that the implied fact—that Brown was not a board certified plastic surgeon—is true. And, because it is true, Gatti's statement loses its defamatory content. It follows that the trial court correctly granted summary judgment to Gatti defendants respecting the statement, and the Court of Appeals' contrary ruling again was error.

In summary, we conclude that the trial court correctly granted summary judgment to Gatti defendants respecting Brown plaintiffs' defamation claim as to the three statements at issue here. We reverse that part of the opinion of the Court of Appeals.

The decision of the Court of Appeals is affirmed in part and reversed in part. The judgment of the circuit court is affirmed in part and reversed in part, and the case is remanded to the circuit court for further proceedings.

## APPENDIX 1: OREGONIAN ARTICLE

Botched liposuction yields $180,000-plus in damages

The Multnomah County jury award to a Vancouver, Wash., woman disappoints her lawyer, who was seeking $2 million

By David R. Anderson of the Oregonian Staff

A Multnomah County jury awarded more than $180,000 on Friday to a woman who was scarred by a botched liposuction procedure.

The award disappointed the woman's lawyer, who was seeking more than $2 million, but he said it still should send a message to doctors who portray themselves as plastic surgeons when they're not.

"It sends notice to doctors who aren't board-certified to notify the public about their true qualifications," said attorney Daniel Gatti.

Bertha "Marie" Nolan, 47, of Vancouver, Wash., went to Dr. Timothy M. Brown, a dermatologist, in December 1995 to fix a double chin and flabby upper arms, Gatti said.

But Brown removed too much fat in some areas and none at all in other areas, Gatti said. That caused grooving, gouging and dimpling on Nolan's skin. In areas where Brown removed all the fat, there was no layer of lubrication left and her skin was attached to muscle and nerves. The procedure also caused neurological damage, leaving her neck and arms numb in some places and painful in others, Gatti said.

It will take at least three plastic surgeries to repair the damage, but even that won't stop the pain or completely fix Nolan's appearance, Gatti said.

Brown's attorney, Mark Wagner, declined to comment after the verdict.

Brown portrayed himself as a plastic and reconstructive surgeon in telephone book ads and literature he gave to potential patients. But he had only the two days of training needed to become certified by the American Academy of Cosmetic Surgeons, which is not recognized by the American Medical Association, Gatti said.

In addition to the negligence claim, Gatti also initially included accusations of intentional fraud and unlawful trade practices against Brown. But during the trial, Gatti agreed to drop those claims and the punitive damages he was seeking against Brown in exchange for Brown admitting he was negligent.

The only questions the jury had to answer were whether Nolan suffered damages and how much she should be compensated. The jury awarded Nolan $33,625 for future medical costs and $150,000 for pain, suffering and humiliation.

Gatti said he has represented two other patients of Brown's, both of whom settled out of court. One settlement is confidential and the other was for $300,000, Gatti said.

Gatti also criticized US West Dex, which publishes the Yellow Pages, for allowing Brown to list himself under plastic and reconstructive surgery. Gatti said he plans to sue US West Dex.

In a prepared statement, US West Dex said it offers a disclaimer at the top of each page listing doctors by type of practice that suggests readers contact state agencies for information on doctor qualifications.

"As a publisher, US West Dex has neither the knowledge nor the authority to administer law, but we must rely on each advertiser to know and comply with all regulations impacting their business," said Wendy Carver-Herbert, a company spokeswoman.

## APPENDIX 2:   KATU BROADCAST TRANSCRIPT

| | | |
|---|---|---|
| CM | - | Cathy Marshall  -  KATU Reporter |
| JM | - | John Marler  -  KATU Reporter |
| SH | - | Sheila Hamilton  -  KATU Reporter |
| DG | - | Dan Gatti |
| MN | - | Marie Nolan |

CM:   Millions turn to these pages for help and guidance but a Washington woman says an ad cost her her health and she is heading to court. Good evening and thank you for joining us. I am Cathy Marshall.

JM:   And I am John Marler.

JM:   It was a botched plastic surgery. There is no dispute now about that. Still to be resolved though, does part of the blame lie with the yellow pages? Sheila Hamilton brings us an exclusive report on a first of its kind lawsuit against Uswestdex.

SH:   When Marie Nolan recovered from a three year illness she thought plastic surgery on her neck and arms might help renew her self-image. She turned to the yellow pages to find a plastic surgeon who specialized in liposuction. Under the heading "plastic and reconstructive surgery", she found the name "Dr. Timothy Brown".

MN:   No matter what the procedure is that you are looking for whether it is you know a child with cancer and you are looking for an oncologist or whether it's you know a serious procedure, or not, you know you are trusting that information is true and that's not necessarily true.

SH:   But Brown was no plastic surgeon and he wasn't certified in plastic surgery. He was a dermatologist practicing liposuction and other types of cosmetic surgery.

MN:   I basically put my life in his hands and hindsight if I had done that to my child, um you know, I'd be responsible.

SH:   And in the hands of Dr. Brown Marie suffered irreparable harm. Here is a picture of her arms before. Here, after. And look at the damage the liposuction did to her neck.

MN:  There was areas where my skin was adhering to the bone. There was gouges and grooves. It was very apparent that it was um I felt a negligent procedure.

SH:  Attorney Dan Gatti knew of Dr. Brown's work. He has now sued him six times for medical negligence in liposuction procedures.

DG:  You can't put a value on the psychological trauma that these women are going through when they are already embarrassed by even having to be in front of a jury and they've made a mistake and then they've been betrayed.

SH:  Gatti won Marie's case against Dr. Brown and is now going after the pages where Brown advertised.

DG:  USWEST Direct is negligent in not at least requiring doctors to somehow certify that they are indeed certified in the area in which they are wanting to advertise to do some sort of minuscule investigation as to whether or not the doctor is qualified.

SH:  Brown still advertises for cosmetic surgery. He has attended four or five two-day workshops on liposuction but Marie Nolan's arms and neck will never look the same and her hope for a positive life change became instead a painful life's lesson.

SH:  Now Gatti is also suing the American Academy of Cosmetic Surgery which trains doctors in brief weekend sessions to perform liposuction and other techniques. John, Cathy.

JM:  Sheila, does USWest have any sort of policy about plastic surgeons and advertising in the yellow pages?

SH:  Actually in this trial USWest testified that all you need to advertise in this section is to be an M.D. so conceivably, a podiatrist could be performing plastic surgery.

JM:  I wonder if that would change now. We'll wait and see.

SH:  I think there may be some changes.

JM:  Shirley, thank you.

CM:    With all that in mind if you are considering plastic surgery here is some important things to keep in mind when selecting a doctor:

CM:    First look for the words "board certified" as a plastic and reconstructive surgeon. They have at least six years of additional educational requirements. Cosmetic surgeons are often certified in brief weekend seminars such as those presented by the American Academy of Cosmetic Surgery.